850 So.2d 383 (2002)
Maurice Lamar FLOYD, Appellant,
v.
STATE of Florida, Appellee.
No. SC95824.
Supreme Court of Florida.
August 22, 2002.
Order Denying Rehearing June 12, 2003.
*387 James B. Gibson, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Maurice Lamar Floyd (Floyd) appeals his conviction of first-degree murder and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Floyd's conviction and sentence of death for premeditated murder, but reverse his conviction for armed burglary. We also reject application of the felony murder theory of Floyd's guilt under these facts.
Mary Goss, the victim in this case, was found dead at approximately 11:30 p.m. on July 13, 1998. Police found her body on the ground beside her house located on Bronson Street in Palatka, Florida. The cause of Ms. Goss's death was a single .357 caliber gunshot that entered the left side of her face and proceeded to sever her brain stem, killing her instantaneously. Two days later, on July 15, 1998, police found Floyd, Ms. Goss's son-in-law, hiding in the attic of a house in the Palatka area. Floyd was subsequently charged with the murder of Ms. Goss.[1]
Testimony adduced at trial indicated that Floyd exhibited very controlling behavior toward his wife, Trelane,[2] who was Ms. Goss's daughter. On July 11, 1998 (extending into the early morning hours of July 12), Trelane had gone with some of her cousins to a supper club to celebrate her birthday. Floyd followed her to the club and spotted her consuming alcohol *388 and dancing. He later approached the group and told Trelane that it would be necessary for her to find another way home, because he was going to take her car, which she had driven to the club. In the past Floyd had expressed his disapproval of Trelane's alcohol consumption.
When Trelane returned home around 5 a.m. on the morning of July 12, Floyd informed her that he would not permit her to sleep, and he proceeded to increase the volume on the televisions and the radio in their apartment. He also threatened to kill Trelane or someone she loved as a reprisal for her drinking or if she ever attempted to run or hide from him. Shortly thereafter, Trelane felt a gun being placed beside her head as she was lying in bed. Floyd pulled the trigger three times, but the weapon did not fire.[3] Trelane advised Floyd that she was going to seek a divorce and testified at trial that she did not call the police about this incident because she was in a very confused state.
On July 13, the day Ms. Goss was murdered, Trelane and Floyd had a heated argument on a Palatka street not far from their apartment. Trelane had stopped her car in the street to speak with a friend. Her three-year-old goddaughter was also in the vehicle. Floyd was in his car behind Trelane and he insisted that Trelane take her goddaughter home, calling Trelane a "whore." Fearful for the safety of both herself and her goddaughter, Trelane decided to seek protection in a sheriff's office. Floyd followed and proceeded to ram his car into the back of Trelane's vehicle.
A high speed chase ensued, during which Trelane sounded the horn on her automobile to warn both oncoming traffic and pedestrians who might be in harm's way. The tires on both cars squealed as they slid into the parking lot at the sheriff's office. Trelane exited her car and screamed for help. Hearing both the sounds of squealing tires and Trelane's plaintive cries, Deputy Dean Kelly responded from his desk inside the sheriff's office. Deputy Kelly was the only armed officer in the vicinity as the events unfolded at approximately 7:30 p.m. that evening. Trelane hurriedly reported to Deputy Kelly that Floyd had rammed her car and that she was fearful for her safety. The deputy saw Floyd moving rapidly toward them as they spoke, and he held out his hand to prevent Floyd from accosting Trelane. He then advised Floyd that he was going to be placed into investigative custody until it could be determined exactly what had transpired. Deputy Kelly instructed Floyd to turn around and to place his hands behind his back. Floyd extended his hands in the air and backed up, insisting that he had done nothing wrong and that he merely wanted to talk to his wife. After the deputy repeated his order for Floyd to submit to custody, Floyd fled the scene. Deputy Kelly began pursuit for a few moments but then halted, fearful of leaving Trelane and her goddaughter defenseless if Floyd decided to double back to attempt to harm them. The subsequent efforts of a K-9 unit and other officers to apprehend Floyd on the evening of July 13 were fruitless.
After giving a statement to sheriff's office personnel, Trelane called her mother, Ms. Goss, from a pay phone at the sheriff's office. Trelane testified that she "told her *389 [mother] what was going on" regarding the incident at the sheriff's office. Ms. Goss informed Trelane that Trelane's three children were at Ms. Goss's house.[4] After hearing what had transpired earlier on the street and at the sheriff's office between Trelane and Floyd, Ms. Goss said of Floyd, "I won't let him get my grandchildren." Ms. Goss was also aware that the twenty-one-year-old Floyd was then on probation for previous violations of the law.
During the trial, several witnesses described the subsequent events that led to the death of Ms. Goss. J.J. Jones, the oldest of Trelane's three children, testified[5] that on July 13, 1998, the day that Ms. Goss was killed, Floyd took him and his two younger siblings to the home of their grandmother, Ms. Goss. J.J. also stated that after he had fallen asleep that evening, Ms. Goss awakened him and instructed him to go to the home of her neighbor, Jeanette Figuero, and to call the police from there. Before he exited Ms. Goss's home, J.J. noted that she was clearly upset. As J.J. was moving toward Jeanette Figuero's home, he noticed that Floyd was "squeezing [Ms. Goss] behind the door" at the front of Ms. Goss's home. Moments later he saw Ms. Goss running outside. J.J. stated that he also observed Floyd standing on Ms. Goss's front porch and firing a gun three times. J.J.'s two siblings, LaJade Evans and Alex Evans, were directly behind him, as Ms. Goss had awakened them also. J.J. testified that he never saw Floyd leave the victim's porch, and that the last thing he observed before pounding on Jeanette Figuero's door for help was his grandmother, Ms. Goss, lying on her back. J.J. eventually led the police to the spot where he thought his grandmother's body would be. As one of the officers directed a flashlight beam on the ground, the light revealed Ms. Goss's lifeless body. Ms. Goss was clad only in a nightgown and was not wearing any undergarments.[6]
LaJade Evans, J.J. Jones' younger sister, testified[7] that she followed J.J. to Ms. Figuero's home to seek help. LaJade saw Floyd on the victim's porch, shooting a gun at the victim. LaJade said Floyd fired two shots from the porch, and that she heard one more shot fired in the direction of the victim. She added that she saw Floyd running toward the victim's home but that he did not go inside the home again after having fired his weapon.
Jeanette Figuero testified[8] that during the evening of July 13, she heard three gunshots followed by the sounds of pounding on her door and the plaintive cries of a child or children saying, "Open the door, open the door, please open the door." Figuero's son, Gary Melendez, opened the door to allow J.J., LaJade, and Alex into the home. Figuero said the children were *390 talking very fast and when she inquired as to the problem, they exclaimed that their grandmother, Ms. Goss, had been shot. When she asked J.J. who shot Ms. Goss, he responded, "Maurice Floyd."[9] Figuero also testified that she heard J.J. mention Floyd's name when he talked to the 911 dispatcher.[10] The prosecutor asked Jeanette Figuero if she believed that J.J. was "smart" and "bright," and whether she believed him when he said that Floyd had shot Ms. Goss. Figuero answered that she believed J.J. was a bright child and that she believed his version of the events, especially after she called over to Ms. Goss from her front porch and received no response.
Figuero also testified that earlier in the evening on July 13, she had been speaking with her neighbor, John Brown, from the porch of her house. Brown mentioned that a young male had been constantly walking up and down the sidewalk in front of Ms. Goss's home. Subsequently, Figuero noticed that a young African-American male was on Ms. Goss's front porch, and was talking to Ms. Goss for some time through the closed screen door. She could not recognize the young male because his back was to her and it was also dark. After leaving her porch for a few moments and then returning, Figuero noticed that the young male had apparently entered Ms. Goss's home. She heard the voice of an angry male emanating from inside the victim's home, addressing Ms. Goss in sometimes profane tones. Figuero testified that she clearly heard the young male say in an angry tone, "Why did she have to involve the GD crackers."[11] She also saw the young male move menacingly toward a person who was sitting on the sofa in Ms. Goss's home. The young male abruptly halted when he noticed that Figuero had spotted him. Figuero stated that she assumed at all times the young male was addressing himself to Ms. Goss because she knew that Ms. Goss was in the home. Approximately twenty-five minutes after hearing the angry male's voice, Figuero heard the sounds of gunfire which led J.J. Jones and his siblings to appear at her door.
John Brown, the neighbor with whom Figuero was speaking earlier that evening, testified that on the evening of July 13 he saw two men walking up and down the sidewalk in the vicinity of Ms. Goss's house. One man, dressed in black, was noticeably taller than the other. The shorter man eventually disappeared from sight, but the taller man continued walking up and down the sidewalk. The man dressed in black eventually made his way up the steps of the home to Ms. Goss's front porch and began talking to her. Brown testified that approximately an *391 hour later he heard a loud "commotion" emanating from Ms. Goss's house, involving a loud, angry male voice. He heard "two big shots" while he was still inside his home and subsequently heard children running. Proceeding to the sidewalk in front of his home, Brown saw a man dressed in black run off the steps of Ms. Goss's home and then run up a side street in a northerly direction. Brown stated that this man "fit the general description" of the "black man" who had dropped off children at Ms. Goss' house earlier in the day on July 13.[12]
Police officers Stokes and Zike responded to the 911 call made from Jeanette Figuero's home. Stokes spoke with J.J. Jones and his sister, LaJade Evans, about what had happened. He noted that they were in a very excited state when he spoke with them. He also stated that when he asked if the children had seen the shooting, they responded that Floyd had fired a gun at their grandmother, Ms. Goss.[13] Zike testified that when he and Stokes entered Ms. Goss's home looking for suspects and clues, they noticed that "the door had been kicked in."[14]
The State did not produce the murder weapon at trial. However, the State did present evidence of a confession that Floyd made to a friend. Tashoni Lamb testified that Floyd visited her apartment around midnight on July 13, and that he left after 6 a.m. on July 14. Floyd asked to speak with Lamb privately, out of the hearing of her children. Lamb stated that Floyd pulled a gun out of the pants he was wearing, placed it on a dresser in the apartment, and said, "I just shot Miss Mary, the grandmother." She related that Floyd's reason for shooting Ms. Goss was that "she had threatened to call the police on him." Lamb stated that she did not call the police because she concluded that they would certainly apprehend Floyd. She further testified that Floyd contacted her by phone later on July 14, a day before he was arrested. When the prosecutor asked at trial if anyone had ever asked her to provide an alibi for Floyd, she responded, "Maurice did." She also testified that during the phone conversation, Floyd asked, "Do you want to see me die?"
When the State sought to introduce evidence of the bullet that killed the victim, Floyd objected, asserting that the State had failed to establish a proper chain of custody for the bullet. The trial judge sustained Floyd's initial objection that the testimony of Detective Mike Lassiter had not established a proper chain of custody, noting that Lassiter could not positively state that the bullet and its jacket were in the same condition at the trial as they were when he last saw them. The State then presented the testimony of Florida Department of Law Enforcement (FDLE) agent Steve Leary, who was the person to whom the medical examiner handed the bullet and jacket after removing them from the victim's head. Leary testified that the bullet and jacket were in the same condition at trial as when he last saw them. The trial judge overruled Floyd's *392 subsequent chain-of-custody objection, on the bases that Leary's testimony established that the items in question were in the same condition at trial as they were when he last saw them, and that Floyd had not satisfied his legal burden of showing the probability that there had been tampering with the bullet and jacket. The trial judge did note, however, that the State could not definitively account for the bullet and jacket in the interval between the time Leary gave the items to an FDLE evidence technician and their introduction into evidence at Floyd's trial.
Medical examiner Dr. Terence Steiner testified that the victim sustained a gunshot injury to her face, facial bones, and brain. The bullet entered the victim through her left cheek, and the cause of death was trauma to the brain caused by a single shot. The manner of death was a homicide. Dr. Steiner stated that during the autopsy he recovered a spent bullet, a bullet jacket, and a lead fragment. He identified those items at trial as the ones he recovered during the autopsy. When Dr. Steiner was asked to describe the physical position of the victim when she was shot, he first opined that based on blood spatter evidence, the victim was "standing up." Moments later, however, he elaborated that "perhaps she was almost maybe kneeling, but she was upright to the injury to the brain, severed the brainstem, which is instantaneous, if you will, death."
After Dr. Steiner's testimony, the State rested and Floyd presented his motion for judgment of acquittal, which was denied. Floyd did not testify in his own defense, nor did he present any witnesses or evidence on his behalf during the guilt phase. The jury convicted Floyd on all charges.[15]
The State introduced victim impact evidence during the penalty phase, along with evidence of Floyd's prior conviction for a violent felony in North Carolina and evidence of his current parole violation. Floyd did not testify in the penalty phase, nor did he present any witnesses or evidence on his behalf. The jury recommended a sentence of death by a vote of eleven to one. A Spencer hearing[16] was held prior to the pronouncement of sentence. In sentencing Floyd to death for the murder of Ms. Goss, the trial judge found four statutory aggravating factors[17] and no statutory mitigating factors. Four nonstatutory mitigating factors were *393 found,[18] with each receiving little weight. The trial judge also sentenced Floyd to thirty years for the armed burglary conviction, and to five years for the aggravated assault conviction. The five-year sentence for aggravated assault was ordered to run concurrently with the thirty-year sentence for armed burglary. This appeal followed.

APPEAL
Floyd raises several issues on appeal.[19] We address issues pertinent to the guilt-innocence phase first, followed by penalty phase issues.

Guilt-Innocence Phase

Jury Selection
Floyd asserts in his first issue that the trial judge impermissibly allowed the State to exercise a peremptory challenge to excuse Noel Rios from the prospective panel, who was identified as a Hispanic male.[20] Floyd contends that the trial judge impermissibly allowed the State to strike Rios from jury service based on racial grounds.[21] We disagree.
During voir dire, two persons, Young and Hardyman, raised their hands (indicating a "yes," or affirmative, response) when the trial judge asked if any members of the venire had religious, moral, or conscientious objections to the imposition of the death penalty. The record does not indicate whether Rios raised his hand in response to this question. Young and Hardyman consistently adhered to the view, after questioning by the trial judge, the State, and the defense, that they would *394 have difficulty in voting to recommend a sentence of death. Defense counsel subsequently engaged in the following exchange with Rios:
DEFENSE COUNSEL: How do you feel about the death penalty?
RIOS: I don't know.
DEFENSE COUNSEL: Don't know at this point?
RIOS: No.
After this exchange, defense counsel moved on to questions unrelated to the death penalty. The State then resumed its questioning of the entire group of prospective jurors that included Young, Hardyman, and Rios. The State asked:
Is there among you, except forexcept for Mr. Young and Mr. Hardyman, anyone that would not seriously consider, if we reach the penalty phase, recommending the death sentence? Is there anyone that would not?
The record does not indicate any answer or other conduct in response to the question. The State concluded its questioning by saying, "Thank you, Your Honor."
Young and Hardyman were excused for cause. The State attempted to use one of its peremptory challenges to excuse Rios. Defense counsel objected, noting that Rios was a Hispanic male, with which the trial judge and the State agreed. The trial judge then asked the State to provide its reason for the peremptory challenge, pursuant to the dictates of Melbourne v. State, 679 So.2d 759, 764-65 (Fla.1996). The prosecutor stated the following:
[When defense counsel] asked Mr. Rios about his feelings about the death penalty, he, by body language and by answer expressed what I perceived to be a negative response with regard to imposition of the death penalty. I saw that response and noted his apparent ... what I perceived to be a dislike for or non-agreement with the death penalty.
I determined peremptorily that he could [be] excused because his answers had been conjured earlier. But when [defense counsel] asked the question, he left me with a definite question that [Mr. Rios] would not vote for the death penalty, or was at least equivocal at best.
The trial judge examined the genuineness of the State's reasons for the strike, and determined that they were race-neutral.
Peremptory challenges are presumed to be exercised in a nondiscriminatory manner. See Melbourne, 679 So.2d at 764. The trial court's decision regarding a peremptory challenge that is alleged to be racially motivated turns primarily on an assessment of credibility and will be affirmed on appeal unless it is clearly erroneous. See id. at 764-65. Our focus here is on the genuineness of the State's reason for excusing Rios. In giving his reason for the peremptory challenge, the prosecutor noted that Rios provided an equivocal answer regarding his views on the death penalty. We have previously determined that no error occurs when a trial judge excuses a prospective juror for cause due to that person's expression of equivocal views on the death penalty. See Sims v. State, 681 So.2d 1112, 1117 (Fla.1996) (prospective juror excused for cause after responding "I am not sure" to prosecutor's question of whether she could vote to recommend a sentence of death); see also Fernandez v. State, 730 So.2d 277, 281 (Fla.1999) (four prospective jurors excused for cause based on "equivocal responses" they gave to inquiries as to whether they could follow the law and recommend a sentence of death). Similarly, then, under the circumstances in Floyd's case the exercise of a peremptory challenge based on the equivocal response of Rios regarding his views on the death penalty does not *395 implicate racial discrimination and is imbued with the requisite genuineness and race-neutrality.
Floyd's assertion that the State's comments concerning Rios's body language demonstrate an intent to engage in purposeful discrimination is unavailing. The State's comments regarding Rios's body language were made within the context of commenting on the oral equivocation voiced by Rios concerning the death penalty. In the cases upon which Floyd relies, unlike in his own, the State relied completely on a prospective juror's body language or on unelaborated bad feelings by the State toward a prospective juror, or the trial judge failed to examine the genuineness of the State's proferred reasons for striking a member of a protected group. Thus, those cases are all distinguishable.
Floyd makes two further assertions in this regard which we also determine to be unavailing. First, Floyd contends that the trial judge committed reversible error by noting for the record that three members of the panel actually selected for jury service were African-American. Floyd asserts that this action was an error of law because the racial composition of the jury is irrelevant to whether a particular peremptory challenge was independently racially motivated. The case on which Floyd primarily relies, State v. Johans, 613 So.2d 1319 (Fla.1993), stands for the much narrower proposition that the trial judge may not look to the composition of the venire as a substitute for asking the proponent of a peremptory challenge for a reason for the challenge. Such did not occur in Floyd's case. We further determine that Floyd is entitled to no relief under Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Powers reflects that a criminal defendant may object to race-based exclusions of jurors that are effected through peremptory challenges, regardless of whether the defendant and the excluded jurors share the same race, which is not violated here. We further note that in Melbourne we stated that "the racial make-up of the venire" is one circumstance that a trial judge may take into account when determining the genuineness and race-neutrality of the reason given for a peremptory challenge. See Melbourne, 679 So.2d at 764 n. 8.
Finally, Floyd asserts that the State's striking of Rios was pretextual because the State did not question Rios during voir dire. Again, we disagree. In State v. Slappy, 522 So.2d 18, 22 (Fla.1988), receded from in part on other grounds by Melbourne v. State, 679 So.2d 759 (Fla.1996), we noted that one factor included in the nonexclusive list of indicia of pretextual discrimination is the "failure to examine the [prospective] juror or [engaging in mere] perfunctory examination, assuming neither the trial court nor opposing counsel had questioned the [prospective] juror." (Emphasis added.) See also Overstreet v. State, 712 So.2d 1174, 1177 (Fla. 3d DCA 1998) (citing Slappy). In Floyd's case defense counsel questioned Rios and elicited the equivocal response on which the State relied as a genuine, race-neutral reason for excusing Rios. We conclude that the trial judge did not err in allowing the State to exercise a peremptory challenge against Rios.

Motion for Judgment of Acquittal
Floyd next asserts that the trial judge erred in denying his motion for judgment of acquittal because the circumstantial evidence in the case was inconsistent with Floyd's reasonable hypothesis of innocence. In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly *396 and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). We have further stated that:
A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch [v. State, 293 So.2d 44 (Fla.1974) ], if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." [Lynch,] 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R.Crim. P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
State v. Law, 559 So.2d 187, 188-89 (Fla. 1989) (citations and footnote omitted).
Floyd asserts that the trial judge should have granted his motion for judgment of acquittal regarding the charge of first-degree murder because he did not premeditate the killing.[22] Floyd contends that the State failed to present evidence to allow the jury to exclude his hypothesis that the killing resulted from nothing more than a "heat of passion" argument in which Floyd did not have a fully formed conscious purpose to kill. We disagree.
Premeditation is "more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla.1998). The use of circumstantial evidence is proper to show that a killing was premeditated. See Woods v. State, 733 So.2d 980, 985 (Fla. 1999). Floyd brought a gun with him to the victim's home on the night of the killing. The defendant's predetermined choice of weapon can be a key factor in determining whether he acted with premeditation. See Spencer v. State, 645 So.2d 377, 380-81(Fla.1994) (evidence that defendant had made previous threats upon his victim-wife, and then parked in area away from victim's house and subsequently stabbed her repeatedly with steak knife he had brought with him was sufficient to establish premeditation); Larry v. State, 104 So.2d 352, 354 (Fla.1958) (nature of the weapon used and manner in which homicide is committed are factors determining whether the defendant acted with premeditation); Wysocki v. State, 715 So.2d 346, 347-48 (Fla. 4th DCA 1998) (in charge of attempted premeditated murder, inference supporting conclusion of premeditation could be drawn from fact that one or more defendants arrived at victim's home with baseball bat that was ultimately used to *397 beat the victim). Floyd's deliberate selection and transportation of a gun to the victim's home is clearly inconsistent with his theory that he argued with the victim and simply shot her in a moment of uncontrolled rage without having fully formed a conscious purpose to kill.
Moreover, Floyd was in Ms. Goss's home for a significant period of time before chasing her, firing shots at her, and eventually killing her. In Roberts v. State, 510 So.2d 885 (Fla.1987), we determined that a defendant had premeditated his actions when he drove up beside a car occupied by three people on a secluded section of a beach, impersonated a police officer and requested identification from two of the car's occupants, and then proceeded to beat one of the occupants with a baseball bat who had questioned whether the defendant was truly a police officer. In concluding that the defendant in Roberts had a fully formed conscious purpose to kill, we rejected the defendant's theory that the killing was nothing more than a "`spontaneous, blind and unreasoning reaction' to the circumstances leading up to the murder." Id. at 888. The events in Roberts appear to have occurred in a time frame equal to, and probably shorter than, the time elements in Floyd's case, thereby strengthening the conclusion that Floyd had many opportunities to premeditate his actions. Floyd argued with the victim in her home for a significant period of time. He told Tashoni Lamb that the victim "threatened to call the police on him." J.J. Jones and LaJade Evans testified that Floyd chased the victim while still in the home and pinned her between a door and door frame at the front of her home. The children then saw or heard a total of three shots being fired. They surmised that the third shot must have produced the fatal injury because J.J. Jones was able to direct police to the spot where he saw Ms. Goss's body lying after the third shot was fired. J.J. saw the victim's body lying on the ground moments before he began pounding on neighbor Jeanette Figuero's front door for help.
We do not endeavor to state with precision the exact moment Floyd premeditated the murder. We simply note that he had many opportunities, at several junctures, to do so before he made and implemented the fateful decision to employ a deadly weapon and actually place it in use. We further note that one day prior to the fateful events of July 13 that led to Ms. Goss's death, Floyd threatened to kill his wife or someone she loved. "No definite length of time for [premeditation] to exist has been set and indeed could not be." Larry, 104 So.2d at 354. Moreover, premeditation may be evinced by the defendant's actions in choosing and transporting a certain weapon and employing that weapon in performance of the killing. See Spencer; Larry; Wysocki. The facts of Floyd's case are inconsistent with his "heat of passion" theory. In a circumstantial evidence case in which there is inconsistency between the defendant's theory of innocence and the evidence when viewed most favorably to the State, the question is for the finder of fact to resolve and the motion for judgment of acquittal must be denied. See Orme v. State, 677 So.2d 258, 262 (Fla.1996).
We further reject Floyd's contention that Tien Wang v. State, 426 So.2d 1004 (Fla. 3d DCA 1983), and Forehand v. State, 126 Fla. 464, 171 So. 241 (1936), compel the conclusion that the killing of Ms. Goss was not premeditated. In Tien Wang, a husband who was having marital difficulties with his wife confronted his wife's stepfather when the stepfather attempted to shepherd the wife/stepdaughter to her homeland. A violent quarrel ensued between the husband and the stepfather, *398 and culminated when the husband stabbed the stepfather. No witness testified to seeing the stabbing, though three witnesses testified that they saw the husband chase the stepfather down a street, and one witness testified that the husband struck the stepfather. The district court noted that "[t]here was no direct evidence elicited by the State bearing on the element of premeditation," Tien Wang, 426 So.2d at 1006, and concluded that the evidence was not entirely inconsistent with the husband's hypothesis that he had never fully formed a conscious purpose to kill. Conversely, the State in Floyd's case presented evidence of his premeditation which is highly inconsistent with his "heat of passion" hypothesis. Therefore, relief based on Tien Wang is not warranted.
Similarly, no relief is warranted under Forehand, in which a defendant shot and killed a deputy sheriff who was struggling with the defendant's brother. In Forehand there was virtually no evidence that the defendant contemplated killing the deputy until he saw him struggling with his brother. Floyd's threatening statements, his choice of a firearm as a weapon, and his transportation of it to the victim's home, along with his subsequent actions as he placed the weapon in use, clearly distinguish his case from Forehand.[23]
We further reject Floyd's contention that his motion for judgment of acquittal should have been granted because the State produced inconsistent testimony regarding the identity of the killer. Specifically, Floyd claims that the testimony of the victim's neighbor, John Brown, conflicts with the testimony of LaJade Evans regarding the whereabouts and identity of the person who shot Ms. Goss. Floyd contends that he "could not have fired the fatal shot" because John Brown saw a man running in a different direction than the one in which LaJade Evans testified that she saw Floyd running. Floyd fails to take into account that LaJade Evans and J.J. Jones testified that they saw him firing a gun at Ms. Goss, and that on both direct and cross-examination neither identified anyone else in the area who could have fired the shots. He also fails to demonstrate that LaJade Evans and John Brown saw events transpiring in the same time frame or from the same vantage point. Most important, John Brown testified that the man he saw running from the vicinity of Ms. Goss's home appeared to be the man who had dropped off children earlier in the day at Ms. Goss's home. The record shows that Floyd dropped off his wife's children earlier in the day on July 13. According to John Brown, the man who dropped off the children was driving a red Honda automobile, which generally matched the description of Floyd's vehicle. There is no plausible explanation how someone other than Floyd happened to be present at the scene of the killing to fire the fatal shot at precisely the time that a third bullet killed Ms. Goss after Floyd had fired and missed with two shots. Floyd's scenario cannot be deemed to be a reasonable hypothesis of innocence. The State is not required to "`rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." State v. Law, 559 So.2d *399 at 189; see also Beasley v. State, 774 So.2d 649, 659 (Fla.2000) (because the State presented competent, substantial evidence that was inconsistent with defendant's theory that an unknown perpetrator killed the victim, trial judge did not err in denying defendant's motion for judgment of acquittal). This the State has done. Therefore, relief is not warranted.
Based upon the circumstantial evidence in this case, we therefore determine that the trial judge did not err in denying Floyd's motion for judgment of acquittal regarding the charge of premeditated murder. We further conclude that competent, substantial evidence supported the jury's verdict on this charge. See State v. Law, 559 So.2d at 188 (in circumstantial evidence case, when competent, substantial evidence supports the jury verdict, this Court will not reverse on appeal).

Chain of Custody
Floyd next contends that the trial judge improperly admitted evidence of the projectile and casing removed from the victim's head by the medical examiner. He claims that the State did not establish a proper chain of custody for the evidence and that the possibility of tampering was not definitively excluded. He also asserts that because the trial judge stated, as he overruled the chain of custody objection, that there was a point in time during which the whereabouts of the evidence were unknown, the bullet and associated material necessarily should not have been admitted. We disagree.
The items admitted by the trial judge were probative of the State's theory that the victim died instantaneously when a bullet fired by Floyd severed the victim's brain stem. After the trial judge sustained Floyd's initial objection regarding the chain of custody, the State presented testimony from Florida Department of Law Enforcement (FDLE) agent Steve Leary. Leary was present when the medical examiner removed the items from the victim, and he had possession of them immediately thereafter. He testified that the items were in the same condition as when he had handed them over to an FDLE evidence technician. The mere fact that the State could not conclusively show the precise location of the items in the interval between Leary's delivery of them to the evidence technician and his testimony at trial does not by itself indicate a probability of tampering, which is what Floyd was required to demonstrate in this situation. See State v. Taplis, 684 So.2d 214, 215 (Fla. 5th DCA 1996) (party attempting to exclude relevant physical evidence based on gap in chain of custody must show probability of tampering); see also Jordan v. State, 707 So.2d 816, 818 (Fla. 5th DCA 1998) (when gap in chain of custody is alleged, party seeking to prevent introduction of relevant physical evidence must show a probability of evidence tampering because "[a] mere possibility of tampering is insufficient") (relying on State v. Taplis), approved, 720 So.2d 1077 (Fla.1998); Bush v. State, 543 So.2d 283, 284 (Fla. 2d DCA 1989) ("A mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence. Rather, the court should consider the probability that the evidence has been tampered with during the interim for which it is unaccounted."). A bare allegation by a defendant that a chain of custody has been broken is not sufficient to render relevant physical evidence inadmissible. See Terry v. State, 668 So.2d 954, 959 n. 4 (Fla.1996). Moreover, absent an abuse of discretion a reviewing court should not second-guess a trial judge's decision regarding the admissibility of evidence. See, e.g., Ray v. State, 755 So.2d 604, 610 (Fla.2000); Jent v. State, 408 So.2d 1024, 1039 (Fla.1981). The trial judge here did not abuse his *400 discretion in admitting the disputed items into evidence. No relief is warranted on this issue, and we also decline Floyd's invitation to depart from the "probability" standard applied in Taplis and other cases.

Hearsay and Bolstering
Floyd asserts that the trial judge erred in overruling hearsay and foundation objections to the testimony of Jeanette Figuero, given in response to the prosecutor's question concerning what J.J. Jones and LaJade Evans told her once they were inside her home, when she responded:
And then the children just told me what happened, said their grandmother was shot, when I asked them what was the matter.
Floyd did not object until Ms. Figuero had fully completed her answer, nor did Floyd move to strike the question and subsequent answer or ask that a curative instruction be given to the jury. Even if the objections were well founded, any error regarding the admission of these statements is harmless, at best. See generally State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).[24] J.J. Jones personally testified as to what he told Ms. Figuero, and the comments by Ms. Figuero were, in many respects, cumulative to the direct eyewitness reports. Therefore, the error, if any, in admitting Ms. Figuero's statement was harmless. See Torres-Arboledo v. State, 524 So.2d 403, 408 (Fla.1988).
Floyd further contends that Ms. Figuero improperly bolstered the credibility of J.J. Jones when, in response to the prosecutor's inquiries, she confirmed that she believed J.J.'s version of the events and stated her belief that J.J. was a "bright" child. Floyd's defense counsel did not contemporaneously object to this testimony. Moreover, all of the cases on which Floyd relies are distinguishable. In those cases either defense counsel timely objected to the asserted improper bolstering, a policeman improperly bolstered the credibility of the only eyewitness to the defendant's criminal act, or an expert opined on a matter not related to her expertise. None of these situations occurred in Floyd's case. We therefore reject Floyd's assertion of entitlement to relief on the basis of fundamental error.

Jury Instruction: Circumstantial Evidence
Floyd raises as his next issue the trial judge's denial of his request to instruct the jury regarding circumstantial evidence. Floyd proposed his own special instruction, which the trial judge declined. Thus, the issue was preserved for review. See State v. Heathcoat, 442 So.2d 955, 956 (Fla.1983) (in criminal case, issue regarding denial of requested jury instruction is preserved for review when the record clearly indicates that "a request was made for a specific instruction and that the trial court clearly understood the request and just as clearly denied [it]"). We determine that the trial judge did not err in denying the requested special jury instruction. We have previously stated that when proper instructions on reasonable doubt and burden of proof are given, an instruction on circumstantial evidence is "unnecessary." See In re Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 595 (Fla. 1981); Trepal v. State, 621 So.2d 1361, 1366 (Fla.1993) (citing In re Standard Jury Instructions.) Floyd makes no assertion that the instructions on reasonable doubt and burden of proof were not given *401 or that they were faulty. We determine that the trial judge did not abuse his discretion in denying the requested instruction on circumstantial evidence.

Jury Instruction: Burglary
Floyd asserts that he is entitled to relief under Valentine v. State, 774 So.2d 934 (Fla. 5th DCA 2001), review dismissed, 790 So.2d 1111 (Fla.2001). On this point we agree, noting that in Floyd's case the jury instruction on burglary was similar to the instruction for which relief was granted in Valentine. We therefore reverse Floyd's conviction for armed burglary.
In Valentine, the trial judge instructed the jury with regard to a burglary charge:[25]
Before you can find the defendant guilty of burglary, the State has to prove the following three elements beyond a reasonable doubt:
One is that Ramon Valentine entered or remained in a conveyance owned by or in the possession of Johanny Rosa;
Two, that Ramon Valentine did not have the permission or consent of Johanny Rosa or anyone authorized to act for her to enter or remain in the conveyance at that time, and at the time of entering or remaining in the conveyance, Ramon L.Valentine had a fully formed conscious intent to commit the offense of burglary with an assault or battery in that conveyance.
....
Even though an unlawful entering or remaining in a conveyance is proved, if the evidence does not establish that it was done with the intent to commit burglary with an assault or battery, the defendant must be found not guilty.
Valentine v. State, 774 So.2d at 937.
In analyzing the above instruction the district court in Valentine stated:
This instruction suggests to the jury that it could convict Valentine [the defendant] if it found that he formed the requisite intent while he remained in the [victim's] vehicle. However, because this is not a case where the facts could support a "surreptitious remaining," Valentine could not be convicted of burglary unless he had the requisite intent when he entered the [victim's] vehicle.
Id. The district court in Valentine granted relief, based on our opinion in Delgado v. State, 776 So.2d 233, 240-42 (Fla.2000), despite the lack of an objection from the defendant to the jury instruction with regard to burglary. See Valentine, 774 So.2d at 937. In Delgado, this Court interpreted the "remaining in" language in Florida's burglary statute[26] to allow a conviction for burglary based upon a defendant remaining in an occupied dwelling only when the defendant's "remaining" therein was performed "surreptitiously."
The instruction in Floyd's case was substantially similar to that in Valentine.[27] *402 Similar to the situation in Valentine, the jury instruction in this case suggests that the jury could have convicted Floyd of burglary[28] if it found that he formed an intent to commit murder while he remained in Ms. Goss's home. As in Valentine, this case is not one "where the facts could support a `surreptitious remaining.'" Valentine, 774 So.2d at 937. Therefore, Floyd is entitled to have his conviction for armed burglary reversed due to fundamental error in the jury instruction.[29] The reversal of Floyd's conviction for armed burglary requires that we also strike the finding of the murder in the course of a felony aggravating circumstance in this case. Moreover, the theory of Floyd's guilt based on felony murder cannot stand. As noted supra, however, the jury also found Floyd guilty based on the theory of premeditated murder. Competent, substantial evidence still supports Floyd's conviction for premeditated murder.

Penalty Phase

Jury Instructions: Mitigating Circumstances
Floyd makes three concurrent assertions of fundamental error regarding the jury instructions, or lack thereof, concerning mitigating factors. First, he asserts that fundamental error occurred when the trial judge, in reading the instructions to the jury, said only that the jury could consider "[a]ny other circumstance of the offense" committed by Floyd. The standard jury instructions require that, unless the defendant requests a different instruction, the trial judge instruct jurors that they may consider as mitigation "[a]ny [other] aspect of the defendant's *403 character, record, or background" and "[a]ny other circumstance of the offense." Fla. Std. Jury Instr. (Crim.) 113 (1997). Floyd never lodged an objection to this instruction as it was read to the jury.[30] Floyd nevertheless claims that fundamental error occurred because the effect of the trial judge's misreading of the instruction was that, in the absence of an instruction that it could consider aspects of Floyd's character, record, or background as mitigation, the jury concluded that it could only consider aggravating circumstances of the killing. Several points militate against this assertion.
Jury instructions are subject to the contemporaneous objection rule, and in the absence of a contemporaneous objection at trial, relief regarding error in the instructions can be granted on appeal only if that error is fundamental. See Archer v. State, 673 So.2d 17, 20 (Fla. 1996). Fundamental error is that which "reaches down into the validity of the trial itself to the extent that a verdict ... could not have been obtained without [that] error." Id. at 20. When a contemporaneous objection could easily have been lodged to bring the lack of completeness or clarity of a jury instruction to the trial judge's attention, we have previously declined to conclude that fundamental error occurred. See Archer, 673 So.2d at 20 (no fundamental error occurred when trial judge utilized the term "reasonable doubt" in jury instruction but then did not define that term for jury, especially in light of lack of contemporaneous objection made to jury instruction as given). In State v. Wilson, 686 So.2d 569 (Fla.1996), we determined that no fundamental error occurred when a preliminary instruction on reasonable doubt was utilized by the trial court that was arguably ambiguous though not entirely incorrect. Though we noted that the trial judge ultimately gave the correct instruction, we also unmistakably stated in Wilson:
In any event, even if it could be said that the judge committed error in making the preliminary comments on reasonable doubt, the error would not be fundamental. Any perceived ambiguity could have been clarified by the simple expedient of calling it to the judge's attention through a proper objection.
Id. at 570. Our reasoning in Archer and Wilson is applicable here because the asserted error in the trial judge's reading of the instruction "could have been clarified by the simple expedient of calling it to the judge's attention through a proper [contemporaneous] objection." Wilson, 686 So.2d at 570. When we further consider that Floyd's defense counsel had and in fact utilized the opportunity in his penalty phase closing argument to fully present and discuss all of the mitigating factors he believed the jury should considerincluding those related to character and backgroundwe are unpersuaded by Floyd's assertion of fundamental error. When we further consider the three strong aggravating factors present in this case, the possible mitigating factors, and the eleven to one jury recommendation for a sentence of death, we conclude that a perfect instruction would not have in any way altered the jury's recommendation here. Therefore, we determine that no relief based on fundamental error is warranted on this matter.
As his next concurrent assertion regarding fundamental error in the jury instructions, Floyd contends that the trial judge erred by not instructing the jury *404 that Floyd's chronological age of twenty-one years could be considered as a mitigating factor. Floyd further contends that the trial judge also fundamentally erred by not considering age as a mitigating factor before imposing a sentence of death. We have previously stated:
[W]here the defendant has requested an instruction on age and submitted reliable evidence tending to link his or her chronological age to "some other [relevant] characteristic of the defendant or the crime," an appropriate instruction should be given.
Campbell v. State, 679 So.2d 720, 726 (Fla. 1996). Floyd did not explicitly request the trial judge to provide an instruction on age as a mitigating factor, nor did he present compelling evidence which could reasonably be inferred to suggest his desire for such an instruction. In the absence of both a request for an instruction on age and any evidence on which the trial judge could base a decision to find it as a mitigating factor, we determine that no error occurred. See also Cooper v. State, 492 So.2d 1059, 1063 (Fla.1986) ("There is no per se rule which pinpoints a particular age as an automatic factor in mitigation.").
In his final contention regarding the jury instructions on mitigating circumstances, Floyd claims that fundamental error resulted from the trial judge's refusal to give his instruction that "only in rare instances can [the trial judge] impose a sentence different than the jury recommend[s]." Floyd contends that the trial judge's refusal to give this instruction resulted in the denigration of the role and responsibility of the jury and therefore violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The record reflects that the trial judge employed the standard jury instruction on this matter. We have repeatedly stated that this instruction properly and fully apprises the jury of its role and responsibility in the penalty phase. See, e.g., Archer, 673 So.2d at 21; Sochor v. State, 619 So.2d 285, 291-92 (Fla.1993). No relief is warranted.[31]

Jury Instruction: HAC Aggravating Circumstance
The next major issue presented by Floyd is the propriety of the trial judge's decision to instruct the jury on the heinous, atrocious, or cruel (HAC) aggravating circumstance.[32] Floyd objected to the giving of the HAC instruction, thus preserving the issue for review. Floyd first asserts that the trial judge erred in relying primarily on evidence adduced during the guilt phase for his decision to instruct the jury on the HAC aggravator.
*405 We disagree. See Brown v. State, 721 So.2d 274, 277-78 (Fla.1998) (trial judge relied primarily on evidence adduced during the guilt phase for decision to instruct on HAC aggravator).
The heart of Floyd's assertions regarding the jury instruction on the HAC aggravator is that competent, substantial evidence did not support the trial judge's decision to give the HAC instruction. Therefore, Floyd claims, the jury was inflamed by the instruction to the point that it thought every murder was heinous, atrocious, or cruel regardless of the circumstances and thereby felt compelled to recommend a sentence of death. Again, we disagree. First, we note that competent, substantial evidence existed which supported the trial judge's decision to utilize the HAC instruction. After Floyd had argued with her, Ms. Goss roused her sleeping grandchildren and sent them out into the night to Jeanette Figuero's home for safety and help, with instructions to call the police. Floyd chased her to both the front and back of the house, causing Ms. Goss to run outside in only her nightgown, even without undergarments. Floyd then pursued her further as he made chase and fired two shots at her, which were off target, before firing the third and fatal shot. The third shot killed Ms. Goss instantaneously. The victim's fear, emotional strain, and terror during the events leading up to this murder may have been properly considered in determining whether the HAC aggravator existed, despite the nearly instantaneous nature of the victim's death. See Pooler v. State, 704 So.2d 1375, 1378 (Fla.1997). Also, "[t]he victim's mental state may be evaluated for purposes of [a determination of the existence of the HAC aggravator] in accordance with a common-sense inference from the circumstances." Id. at 1378. Moreover, where competent, substantial evidence supports the trial judge's decision to do so, it is not error to instruct the jury on the HAC aggravator. See Cave v. State, 727 So.2d 227, 229 (Fla.1998) (no error where competent, substantial evidence supported both the instruction on the HAC aggravator and the trial judge's ultimate finding of HAC); Brown v. State, 721 So.2d at 277 n. 7 (no error in instructing jury on HAC aggravator where competent, substantial evidence also supported finding of HAC). It is not illogical to conclude that Ms. Goss was in a significant state of emotional strain and terror as she ran, barely clad, outside her home in an attempt to elude a killer who not only chased her with a deadly weapon but also fired and missed with multiple shots before mortally wounding her by severing her brain stem with the third shot. Thus, we find no error in the trial judge's decision to instruct on the heinous, atrocious, or cruel aggravating circumstance.[33]

Avoid Arrest Aggravating Circumstance
Floyd asserts a lack of competent, substantial evidence to support the trial court's finding of the aggravating circumstance that the killing of Ms. Goss was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody. We agree with the *406 trial judge's determination that evidence established beyond a reasonable doubt that Floyd committed the murder for the purpose of avoiding or preventing his lawful arrest.[34]
In Rodriguez v. State, 753 So.2d 29, 47-48 (Fla.2000), we stated that when a killing of a police officer is not involved, the proof regarding the finding of the avoid arrest aggravator "must demonstrate beyond a reasonable doubt that the victim was murdered solely or predominantly for the purpose of witness elimination." We have also stated that "the avoid arrest aggravator can be supported by circumstantial evidence through inference from the facts shown." Foster v. State, 778 So.2d 906, 918 (Fla.2000). Furthermore, in Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998), we stated:
We have found the avoiding-arrest aggravator in cases where the defendant's own statements demonstrate that the primary motive for the murder was the elimination of witnesses. See, e.g., Remeta v. State, 522 So.2d 825, 827 (Fla. 1988) ("Anytime I seen a witness, I took him out, or at least shot him."); Kokal v. State, 492 So.2d 1317, 1319 (Fla.1986) ("[D]ead men can't tell lies.")....
We also note that "[a] confession is direct evidence in Florida." Walls v. State, 641 So.2d 381, 390 (Fla.1994) (determining that defendant's own incriminating confession of having committed the murder provided primary support for finding avoid arrest aggravator).
Tashoni Lamb, whom Floyd visited not long after Ms. Goss was killed, testified that Floyd asked to speak with her privately and proceeded to exhibit a firearm and place it on a dresser. Floyd then stated, "I just shot Miss Mary, the grandmother." Lamb testified that Floyd expressed the reason for the shooting to be because "[Ms. Goss] had threatened to call the police on him."
Ms. Goss was aware that Floyd was on probation for previous offenses and that he had fled from Deputy Dean Kelly at the sheriff's office after refusing to submit to custody to afford Kelly an opportunity to investigate the confrontation between Floyd and Trelane, Floyd's wife. Floyd was undoubtedly aware that a probation violation would produce serious repercussions.
Floyd places primary reliance on a trio of cases for his assertion that the avoid arrest aggravator is inapplicable; however, each case is distinguishable. In Urbin v. State, 714 So.2d 411, 416 (Fla.1998), a key witness who testified that the defendant shot the victim because the victim saw the defendant's face also testified that the defendant shot the victim because he resisted the defendant's robbery attempt. Conversely, there is no such contradiction of Tashoni Lamb's testimony that Floyd confirmed the reason he killed Ms. Goss was because she was going to report him to the police. Moreover, we also stated in Urbin that the factual situation there "more closely resemble[d] the fatal confrontation in Cook v. State, 542 So.2d 964, 970 (Fla. 1989), wherein we found that the facts indicated that the defendant `shot instinctively, not with a calculated plan to eliminate [the victim] as a witness.'" Urbin, 714 So.2d at 416. No such instinctive or reflexive shooting occurred in this case. In a similar manner, in Mahn v. State, 714 So.2d 391, 403 (Fla.1998), we determined that the defendant's statement that "she tried to get me, and I struck her too, stabbed her," with regard to the death of a female victim, did not provide sufficient evidence that the defendant's dominant *407 motive was witness elimination. Unlike the statement in Mahn, Floyd's confession to Tashoni Lamb here clearly shows witness elimination as a motive for the killing of Ms. Goss. We agree with the trial judge that Floyd's confession provides direct proof of witness elimination as Floyd's dominant motive. In the third case upon which Floyd relies, Consalvo v. State, 697 So.2d 805 (Fla.1996), we actually upheld the finding of the avoid arrest aggravator and upon analysis conclude that no relief is justified under Consalvo.
We cannot agree with Floyd's position that the sole or dominant motive for the killing was revenge as to his wife's failure to follow his directives not to smoke, drink, or stay out late at night. Although the issue may be debated and contested, such does not overcome the direct evidence which supports the determination below beyond a reasonable doubt. See generally Knight v. State, 746 So.2d 423, 435 (Fla. 1998). Considering all of the evidence discussed supra, especially Floyd's uncontradicted confession of having killed Ms. Goss because she "had threatened to call the police on him," we determine that no relief is warranted on the issue of the avoid arrest aggravating circumstance.

Victim Impact Evidence
Floyd claims that the trial judge impermissibly admitted victim impact evidence during the penalty phase which prejudiced jurors against him and compelled them to return a recommendation of a sentence of death. Floyd provides no precedent in which we have held that reversible error occurred regarding the admission of victim impact evidence in situations similar to his case. His assertion is basically a policy argument that we should recede from the following language in Windom v. State, 656 So.2d 432, 438 (Fla. 1995):
We do not believe that the procedure for addressing victim impact evidence, as set forth in the statute, impermissibly affects the weighing of the aggravators and mitigators which we approved in State v. Dixon, 283 So.2d 1 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), or otherwise interferes with the constitutional rights of the defendant. Therefore, we reject the argument which classifies victim impact evidence as a nonstatutory aggravator in an attempt to exclude it during the sentencing phase of a capital case.
We decline Floyd's invitation to recede from Windom, and find no error in the admission of victim impact evidence in this case.[35]

Prosecutor's Penalty Phase Closing Argument
Floyd asserts that fundamental error occurred when the prosecutor, without a defense objection voiced, ended his penalty phase closing argument by saying:
Let the final chapter be justice was done. This man not only deserves but the law requires that he receive the death penalty.
Relying on Henyard v. State, 689 So.2d 239 (Fla.1996), Floyd claims that fundamental error occurred because a jury is never required to vote to recommend the death penalty. In Henyard, a prosecutor on three separate occasions told jurors that if the aggravating factors outweighed the mitigating factors, they must recommend a sentence of death. We determined in that case that the prosecutor had misstated the law, but that the comments did *408 not rise to the level of fundamental error when viewed in the totality of the entire trial. We further determined that if any error occurred such was harmless. Here, with regard to the prosecutor's statement, to the extent that it might have implied that the jury was bound by law and had no option but to recommend a sentence of death, we disapprove its content. However, the remark in Floyd's case was isolated, not repeated as in Henyard, and could be interpreted as an evaluation of the evidence and the conclusions to be drawn from such evidence. Moreover, just as in Henyard, the trial judge here properly instructed the jury on its role in the sentencing process. Given the three strong aggravators in Floyd's case and the paucity of mitigation, we determine that any error that may have been engendered by the prosecutor's statements was harmless. Any error with regard to this issue in no way "affected the foundation of the case." Sanford v. Rubin, 237 So.2d 134, 137 (Fla. 1970). Therefore, we deny relief on this issue.

Cumulative Error
Floyd states that the cumulative effect of errors committed throughout his trial entitles him to relief. We disagree. Any errors that occurred during Floyd's trial were harmless. There is no reasonable probability that the cumulative effect of these errors affected Floyd's right to a fair trial. Therefore, we deny relief on this issue. See generally Whitton v. State, 649 So.2d 861, 864-66 (Fla.1994) (applying cumulative error analysis and determining there was no reasonable probability that the cumulative impact of harmless errors affected either the jury's verdict or the defendant's overall right to a fair trial).

Proportionality
Finally, Floyd claims that his sentence of death is not proportional under the circumstances of his case and the decisions of this Court. Floyd emphasizes that the killing of Ms. Goss was nothing more than a "heat of passion" slaying for which a sentence of death is not warranted. We rejected Floyd's "heat of passion" assertion, supra, and therefore find the cases on which Floyd relies for this point to be inapplicable.
Nor do we find a proportionality problem here despite our striking of the murder in the course of a felony aggravating circumstance and our determination that a theory of Floyd's guilt based on felony murder cannot stand. As discussed supra, competent, substantial evidence supports the conviction in this case on the charge of premeditated murder. Also, three aggravating circumstances remain after striking the murder in the course of a felony aggravator,[36] in contrast to scant mitigation given little weight by the trial judge. When sufficient aggravating circumstances have remained after the striking of others on appeal and those remaining aggravators were not outweighed by mitigating circumstances, we have previously affirmed a trial judge's sentence of death. See, e.g., Hill v. State, 515 So.2d 176 (Fla.1987) (affirming the sentence of death despite the striking of the cold, calculated, and premeditated aggravating circumstance, where three other aggravating circumstances remained and were not outweighed *409 by statutory mitigating circumstance of defendant's age); Rogers v. State, 511 So.2d 526 (Fla.1987) (affirming the sentence of death despite the striking of aggravating circumstances of cold, calculated, and premeditated, pecuniary gain, and committed during course of an attempted robbery, where two other aggravating circumstances remained in contrast to no mitigating circumstances).
In Williams v. State, 437 So.2d 133 (Fla. 1983), we affirmed a sentence of death when the trial judge found the aggravating circumstances of committed by a person under sentence of imprisonment[37] and having committed a prior violent felony. Both of these aggravating circumstances also remain in Floyd's case. The trial judge in Williams found no mitigating circumstances, despite the presentation of evidence at the sentencing hearing that the defendant was a good and kind person. In Floyd's case the trial judge found, but gave little weight to, the mitigating circumstances that Floyd displayed exemplary courtroom behavior, that he assisted his defense counsel with notetaking, that he was successfully completing his probation before murdering Ms. Goss, and that he expressed concern that his wife not subject their marriage to the stresses attendant to alcohol consumption. We determine that the trial judge did not abuse his discretion in giving little weight to these mitigating circumstances and in deciding that they did not outweigh the aggravating circumstances. Moreover, when we consider that although the murder in the course of a felony aggravator no longer applies, three aggravating circumstances still remain which are not outweighed by the scant mitigation in Floyd's case, "we [conclude] that the erroneous consideration of the [murder in the course of a felony] aggravating circumstance ... [does not present] such a change under the circumstances of this sentencing proceeding that its elimination could possibly compromise the weighing process of either the jury or the judge." Hill, 515 So.2d at 179.
Floyd's argument that the cases of Farinas v. State, 569 So.2d 425 (Fla.1990), and White v. State, 616 So.2d 21 (Fla.1993), demonstrate the lack of proportionality in his death sentence is misplaced. In both Farinas and White, our decision that a life sentence was proper was based in large measure on the significant amount of mental health mitigation present in each case. No similar situation exists here and, therefore, relief based on Farinas and White is not warranted. Our proportionality review leads us to conclude that the death sentence was properly imposed in Floyd's case.

CONCLUSION
In our view, the only relief to which Floyd is entitled is the reversal of his conviction for armed burglary and the striking of the murder in the course of a felony aggravating circumstance. Competent, substantial evidence supports his conviction for premeditated murder, and the sentence of death for this conviction is proportional. Competent, substantial evidence also supports Floyd's conviction for aggravated assault. Accordingly, we affirm Floyd's conviction for first-degree murder and the sentence of death, along with the conviction and sentence for aggravated assault.
It is so ordered.
*410 ANSTEAD, C.J., and SHAW, HARDING, PARIENTE, and QUINCE, JJ., concur.
LEWIS, J., concurs specially with an opinion.
WELLS, J., concurs in part and dissents in part with an opinion.
LEWIS, J., concurring specially.
I fully concur in the majority's reasoning and determination in this case to affirm the conviction and sentence for first-degree murder (based on the premeditated murder theory) and to affirm the conviction and sentence for aggravated assault. It is with reluctance, however, that I concur in the majority's decision to reverse Floyd's conviction for armed burglary and the striking of the aggravating factor related thereto. In Delgado v. State, 776 So.2d 233, 238-40 (Fla.2000), a majority of this Court interpreted the "remaining in" language in Florida's burglary statute to allow a conviction for burglary, when the defendant remains in an occupied dwelling, but only when the defendant has "surreptitiously remained therein." I am respectful that under the rule of stare decisis the reasoning in Delgado controls the issue with regard to Floyd's armed burglary conviction here. Nevertheless, I continue to hold the view that Delgado was wrongly decided and that the dissent in Delgado, with which I concurred, expressed the proper interpretation of the burglary statute as applied to the events both in that case and in the instant case.
WELLS, J., concurring in part and dissenting in part.
I concur in affirming Floyd's conviction for first-degree murder and his sentence of death. However, I dissent from the majority's reversing of Floyd's conviction for armed robbery. This Court's decision in Delgado v. State, 776 So.2d 233, 240 (Fla. 2000), is not applicable to Floyd's conviction.
In Delgado, 776 So.2d at 240, this Court receded from this Court's established precedent to determine that the "remaining in" language of Florida's burglary statute[38] applied "only in situations where the remaining in was done surreptitiously." The original Delgado opinion was released by this Court on February 3, 2000, see Delgado, 25 Fla. L. Weekly S79 (Fla. Feb. 3, 2000), but was subsequently withdrawn when the revised opinion dated August 24, 2000, was released. See Delgado, 776 So.2d at 233. The revised opinion did not alter the February 3, 2000, Delgado opinion's new interpretation of the burglary statute.
On May 25, 2001, the Governor approved House Bill 953, which created section 810.015(2), Florida Statutes (2001). See ch.2001-58, § 1, at 404, Laws of Fla. Section 810.015(2) states that "[i]t is the intent of the Legislature that the holding in Delgado v. State, Slip Opinion No. SC88638 be nullified." The statute further provides that the burglary statute should be construed in accord with this Court's precedent as established prior to Delgado. See § 810.015(2), Fla. Stat. In nullifying Delgado, the Legislature stated that section 810.015(2) "shall operate retroactively to February 1, 2000." This retroactivity provision was obviously included so that the original February 3, 2000, Delgado decision would be included in the nullification. As the Third District Court of Appeal recently stated in Braggs v. State, 815 So.2d 657 (Fla. 3d DCA 2002) (en banc):
[I]t is permissible to consider the legislative history of chapter 2001-58 to determine why the February 1, 2000 date *411 was chosen. It turns out that the Delgado opinion was first released by the Florida Supreme Court on February 3, 2000. It is evident the February 1 date was chosen in an effort to turn back the clock to the interpretation of the burglary statute as it existed two days prior to the original release of the Delgado opinion. As stated in the House of Representatives legislative history, "The purpose of this provision is to `resettle' the law with respect to pending burglaries...." House of Representatives Committee on Crime Prevention, Corrections & Safety Final Analysis, Bill No. HB953(PCB CPCS 01-03), June 26, 2001.
It is therefore clear that the statement of intent in chapter 2001-58 is meant to apply to pending cases, which would include the appeal now before us.
Id. at 660 (citation and footnotes omitted).[39] Thus, contrary to the majority's determination, see majority op. at 402, note 29, the retroactivity provision was not included to make section 810.015(2) only applicable to crimes occurring on or after February 1, 2000.[40]
Another reference in the legislative staff analysis prepared for House Bill 953 supports the conclusion that the retroactivity language in section 810.015(2) was included to completely nullify the Delgado decision. In discussing what would occur to the defendant in Delgado after the enactment of section 810.015, the analysis states:
Since this defendant has been granted a new trial based on a construction of the statute which would be expressly rejected by the Legislature, and it would be the intent of the Legislature that the law be returned to what it was before he was granted a new trial, it is unclear how the courts will resolve the matter of the Delgado retrial. On one hand, the restoration of the law back to the same posture it was when he was tried initially would indicate that the basis for the new trial has been nullified as a matter of law. On the other hand, the law as applied to this particular case is that he receive a new trial. If he is retried, he will either get a retrial based on the very same law under which he was initially convicted, or be the only person in Florida to get a retrial based on the Court's erroneous interpretation of burglary.

Fla. H.R. Comm. on Crime Prev., Correct. & Saf., HB 953 (2001) Staff Analysis 7 (final June 26, 2001) (on file with comm.) (emphasis added). Thus, the Legislature clearly intended to nullify Delgado so that Delgado would not be applicable to defendants convicted of burglary under this Court's precedent prior to Delgado.
This Court's decision in Jimenez v. State, 810 So.2d 511 (Fla.2001), also supports this conclusion. Immediately after we released the Delgado opinion, Jose Jimenez filed a 3.850 motion asserting that Delgado should be applied retroactively to invalidate Jimenez's 1994 burglary conviction. *412 See Jimenez, 810 So.2d at 512. This Court denied relief for two reasons. First, the Delgado decision did not meet the criteria of the analysis provided by Witt v. State, 387 So.2d 922 (Fla.1980), and therefore was not given retroactive application to Jimenez's final burglary conviction. Second, this Court denied relief because "the Legislature declared that Delgado was decided contrary to legislative intent and that this Court's interpretation of the burglary statute in Jimenez's direct appeal was in harmony with legislative intent." Id. at 513. This Court's second reason for denying Jimenez reliefthat Jimenez's conviction was in harmony with legislative intentsupports my conclusion that Floyd's armed burglary conviction, which is also in harmony with legislative intent, should be affirmed.
I conclude that Delgado is not applicable to Floyd's conviction for armed burglary and that Floyd is not entitled to have that conviction reversed. The intent of section 810.015 is to validate all burglary convictions which were properly based on the law as established prior to Delgado. See Braggs, 815 So.2d at 660; see also Jimenez, 810 So.2d at 513. In her dissent in Braggs, Judge Green was precisely correct as to what should be the plain effect of this Court's decision and opinion in Jimenez, as noted by Judge Ervin in his dissent in Foster v. State, 27 Fla. L. Weekly D1360, D1362, ___ So.2d ___, ___, 2002 WL 1285453 (Fla. 1st DCA June 12, 2002). Likewise, I agree with the analysis set forth by Judge Ervin on this issue. Floyd was properly convicted of armed burglary under this Court's precedent as established prior to Delgado, and therefore his conviction is valid. See, e.g., Raleigh v. State, 705 So.2d 1324 (Fla.1997); Jimenez v. State, 703 So.2d 437 (Fla.1997). I would affirm Floyd's conviction for armed burglary and give force and effect to the undeniable legislative intent that the Delgado decision be nullified.
Moreover, in view of the date that Floyd's crimes were committed, there is no logical reason to apply Delgado. Burglary is a statutory crime, the definition of which is within the prerogative of the Legislature. Floyd committed this crime on July 13, 1998, a time when the burglary statute had been defined so that Floyd's actions would have constituted burglary under Routly v. State, 440 So.2d 1257 (Fla.1983), and Ray v. State, 522 So.2d 963 (Fla. 3d DCA 1988), which are two of the cases listed in section 810.015(2), Florida Statutes. Floyd was convicted on April 7, 1999, which was likewise before the Delgado decision was issued. Simply because Delgado was issued while Floyd's case was on appeal provides no reason why he should receive the benefit of that nullified decision. The key date for Floyd was July 13, 1998, when he committed the crime, because he was on notice at that time as to what the burglary statute said and meant. He should not receive this windfall. Rather, this Court should give deference to the Legislature, which is here clearly appropriate.

ON MOTION FOR REHEARING
Appellant's and appellee's motions for rehearing or clarification are denied.
WELLS, J., concurring.
I believe that the majority opinion errs in determining that the trial court committed fundamental error by giving the jury instruction for burglary that included language relating to the "remaining in" portion of the burglary statute. See § 810.02(1), Fla. Stat. (1997).
The decision in Delgado v. State, 776 So.2d 233, 240-42 (Fla.2000), is not applicable to the present case because the present case does not support the affirmative defense of consensual entry. Because consensual entry was not established, the fact that the jury instruction given in this case referred to the "remaining in" language is irrelevant. In Delgado, "[t]he State prosecuted *413 this case on the premise that [Delgado's] entry into the victims' home was consensual (i.e., [Delgado] was invited to enter the victims' home) but that at some point, this consent was withdrawn." Id. at 236. This Court stated:
[C]onsensual entry is an affirmative defense to the charge of burglary, and therefore the burden is on the defendant to establish that there was consent to enter. Evidence presented by the State can also establish a defendant's affirmative defense. In the present case, there exists sufficient evidence in the record that [Delgado] met his burden of establishing consensual entry.[n.]
[n.] In addition to the testimony from the police that there were no signs of a forced entry, a review of the record reveals that the State made numerous remarks throughout the trial which indicate that its theory was withdrawn consent after entry: "A burglary requires a remaining in after such time as consent has been withdrawn .... Someone comes to your house initially, you let them in, and they become loud or boisterous ... and you just don't want them there anymore,"
"Tomas Rodriquez did not hate or have any problems with Jesus Delgado, after all he let him in," and "Burglary was established at the time the defendant chose to remain in that house against the will of Violetta and Tomas Rodriguez."
Id. at 240 (citations omitted) (emphasis added). The Delgado majority concluded that burglary was not justified in consensual entry cases unless the defendant remained in the dwelling "surreptitiously." Id. at 240.
After Delgado became final, this Court affirmed a burglary conviction in Francis v. State, 808 So.2d 110 (Fla.2001), where the burglary instruction given was substantially similar to the one given in the present case.[1] This Court stated:
In Delgado, we held that burglary is not intended to cover a situation where an invited guest turns criminal or violent once he peaceably gains entry. Delgado, however, reiterates the well-settled rule that the burden is on the defendant to establish consent. In this case, the defendant at no point argued, or even suggested, that the victims invited him into the home. It is important to note that the absence of evidence of forced entry and the presence of evidence indicating that a defendant is known to the victims does not necessarily translate into entry by consent as a matter of law. There are a host of non-consensual scenarios, including: the defendant entered, without an invitation, through an unlocked door; the defendant used the key that the victims kept hidden; or the defendant pushed his way into the house after the victims opened the door in response to his knock.
Id. at 133-34 (citations omitted). Although the jury instruction given in Francis included language relating to the "remaining in" portion of the burglary statute, this Court affirmed the burglary conviction because the defendant had not established that there was consensual entry, and therefore Delgado was not applicable. See id. at 134.
After Francis, this Court again affirmed a defendant's burglary conviction despite the fact that the jury instruction included *414 the "remaining in" language. Woodel v. State, 804 So.2d 316, 322 (Fla.2001).[2] In Woodel, this Court stated that "Woodel specifically states in his confession that he did not have permission to be in the trailer and that he intended to hit" the victim. Id. Because Woodel had not raised and established the affirmative defense of consensual entry, Delgado was not an issue in that case. During oral argument before this Court, Woodel's appellate counsel indicated that Delgado was not implicated in this case because there was no consensual entry. The fact that the jury instruction given in Woodel mentioned the "remaining in" language did not render Woodel's burglary conviction invalid.
Thus, I conclude that this Court's decision in Delgado is only applicable when the defendant establishes the affirmative defense of consensual entry or when the State concedes that there was a consensual entry. See also Mosley v. State, 842 So.2d 855, 857 (Fla. 1st DCA 2002); Johnekins v. State, 823 So.2d 253, 257 (Fla. 3d DCA 2002). Neither occurred in the present case. Floyd in no way affirmatively established that he entered the victim's residence consensually. In fact, at no time did Floyd's counsel argue to the jury that Floyd entered the victim's residence consensually. Floyd's counsel argued that although Floyd had been seen confronting the victim, someone else committed the murder. Because Floyd has failed to carry his burden in establishing that the entry into the victim's dwelling was consensual, Delgado is not applicable to this case and Floyd's burglary conviction should be affirmed. See Woodel, 804 So.2d at 322; Francis, 808 So.2d at 133.
The majority erroneously overextends the Fifth District's decision in Valentine v. State, 774 So.2d 934 (Fla. 5th DCA 2001). A reading of Valentine shows that, in respect to the "remaining in" language in the burglary instruction, the Fifth District's opinion does not mention fundamental error. Fundamental error is only mentioned in respect to that portion of the burglary instruction which stated that "Valentine had to enter the vehicle with the intent to commit a `burglary' rather than with intent to commit some distinct, underlying offense." Id. at 936. That issue was conceded by the State. The holding of the Fifth District in respect to the Delgado issue was:
However, because this is not a case where the facts could support a "surreptitious remaining," Valentine could not be convicted of burglary unless he had the requisite intent when he entered the vehicle. Accord Bledsoe v. State, 764 So.2d 927 (Fla. 2d DCA 2000) (defendant could not be convicted of burglary for remaining at party after hostess asked him to leave). In light of these errors in the instructions, Valentine is entitled to a new trial.
Valentine, 774 So.2d at 937 (emphasis added). It must also be noted that the Fifth District in Valentine did not hold that the instruction was erroneous. The Fifth District held that the instruction was incomplete. Finally, Bledsoe v. State, 764 So.2d *415 927 (Fla. 2d DCA 2000), which Valentine cites from the Second District, is a case which fits within Delgado since in that case, as in Delgado, the facts were that the defendant was invited into the home.
The statement in the majority is erroneous factually because the record does not support a "consensual entry." The majority points to no record facts in support of this statement. More importantly, the record without question does not support any contention that the defendant met the burden of establishing consensual entry as an "affirmative defense," which as earlier pointed out is precisely what Delgado states is required. The majority ignores its own recitation of the facts in which the salient evidence was that the victim, Mrs. Goss, knew before Floyd arrived at her porch of the present and ongoing threat to her daughter because Mrs. Goss's daughter had called and "told [Mrs. Goss] what was going on." In response to learning of these threats, Mrs. Goss stated that the grandchildren were with her and that "I won't let him get my grandchildren."
Furthermore, when Mrs. Goss's body was found, the victim was not wearing any undergarments. In footnote 6 of the opinion issued August 22, 2002, the majority states: "Ms. Goss's husband, Clifford Goss, testified that his wife never received guests in her home unless she was fully dressed. He said that she would never have company inside her home if she was not wearing undergarments." Majority op. at 389 n.6. Thus, contrary to the majority's conclusion that "there is evidence of a consensual entry," the record supports that there was no consensual entry as was found by the trial court in its sentencing order:
In the verdict returned in this case the jury found the defendant was guilty of first degree murder as well as armed burglary of Mrs. Goss' dwelling which is part of the transaction that led to her death. There is no question that Mr. Floyd came to the Goss residence with an evil intent. He entered the premises by force causing damage to a door frame in the process of entry and awakened Mrs. Goss who had disrobed and was sleeping in her nightwear. A verbal confrontation occurred on the premises between Mr. Floyd and Mrs. Goss during which she did what she could to usher her three young grandchildren out of her home and across the street to the safety of the neighbors's residence. With that safely accomplished she attempted to flee the house with Mr. Floyd in pursuit.
State v. Floyd, No. 98-1315-CF at 3 (Fla. 7th Cir. Ct. order filed May 26, 1999) (emphasis added).
The fact that the instruction given in the present case included the statutory "remaining in" language should not render Floyd's burglary conviction per se invalid. Plainly and simply, there was no issue in Floyd's case about the meaning or applicability of the burglary statute, as there was in Delgado where there was without question consensual entry. From a reading of Delgado, it is obvious that Delgado was not intended to reverse all nonfinal burglary convictions based on fundamental error simply because the instruction followed the then-existing law and used the words "remaining in," without the word "surreptitiously." The majority's holding that fundamental error occurred in this case unnecessarily expands Delgado beyond its intended scope. Additionally, it is illogical and unreasonable to conclude that the trial court in this case fundamentally erred by instructing the jury based on the express terms of the burglary statute and on this Court's then-existing precedent. When Floyd's counsel was asked about the instruction by the trial judge, counsel not *416 only did not object to the given instruction, counsel affirmatively stated "no objection."
In essence, what occurred with this instruction was that the instruction given was not wrong, but as the Fifth District said in Valentine, 774 So.2d at 937, the instruction was "incomplete in light of Delgado." This means that, at worst, the instruction would be "vague" under the Delgado interpretation of the burglary statute. It would be vague because it did not state that "remaining in" meant "surreptitiously remaining in." In this regard, it would be similar to what this Court determined concerning the cold, calculated, and premeditated (CCP) instruction in Jackson v. State, 648 So.2d 85 (Fla.1994).
In Jackson, this Court found the CCP instruction to be unconstitutionally vague but did not find that this was fundamental error. To the contrary, this Court held:

Claims that the instruction on the [CCP] aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal. James v. State, 615 So.2d 668, 669 & n. 3 (Fla.1993). However, Jackson objected to the form of the instruction at trial, asked for an expanded instruction which essentially mirrored this Court's case law explanations of the terms, and raised the constitutionality of the instruction in this appeal as well. Thus, the issue has been properly preserved for review.
As the Supreme Court explained in Sochor v. Florida, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), while a jury is likely to disregard an aggravating factor upon which it has been properly instructed but which is unsupported by the evidence, the jury is "unlikely to disregard a theory flawed in law." See also Griffin v. United States, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) ("When jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.").
Jackson v. State, 648 So.2d at 90 (emphasis added). It is seen that in Jackson this Court also held that it was necessary to preserve an objection to an instruction in order to get the benefit of the rule of Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). See also Pope v. State, 702 So.2d 221, 223 (Fla.1997); Walls v. State, 641 So.2d 381, 387 (Fla.1994). Applying the same reasoning as set out in Pope to these cases, if the defendant's contention at the trial was that the instruction on burglary should have the "remaining in" part of the instruction explained in more detail, the defendant must have objected and "must attack the instruction itself, either by submitting a limiting instruction or by making an objection to the instruction as worded." Pope, 702 So.2d at 223-24.
In sum, Delgado should not be extended to cases, such as the present one, in which the defendant did not establish that entry was consensual and the evidence supports a nonconsensual entry with intent to commit an offense. See Woodel, 804 So.2d at 322; Francis, 808 So.2d at 133. The majority errs by further extending Delgado to these situations based on a broad application of fundamental error.
ANSTEAD, C.J., and SHAW, Senior Justice, concur.
NOTES
[1] The indictment returned against Floyd was for premeditated murder or felony murder (Count I), armed burglary of a dwelling (Count II), and aggravated assault (Count III).
[2] When she testified at trial, Trelane was no longer married to Floyd.
[3] The record does not indicate whether the gun was loaded at that time. Later in the day on July 12 (one day before Ms. Goss was murdered), Trelane surmised that the gun must have been a .357, because she saw a.357 on the toilet tank in the bathroom when Floyd was showering. She hid the gun behind the bar in their apartment, and testified that she never saw the gun again.
[4] Earlier on July 13, Floyd had transported Trelane's three children to be with their grandmother, Ms. Goss.
[5] J.J. Jones was eight years old when he testified. The trial judge engaged in witness-qualification procedures to ensure that J.J. was capable of understanding the proceedings and that he understood his responsibility to testify truthfully. After the trial judge indicated that he was prepared to have J.J. sworn as a witness, the defense voiced no objection.
[6] Ms. Goss's husband, Clifford Goss, testified that his wife never received guests in her home unless she was fully dressed. He said that she would never have company inside her home if she was not wearing undergarments.
[7] LaJade Evans was six years old when she testified. After the trial judge and the State asked qualifying questions, LaJade was sworn as a witness. The defense did not object.
[8] In the chronology of the trial, Jeanette Figuero testified before J.J. Jones.
[9] Floyd's objection to this testimony as inadmissible hearsay and lacking in foundation was overruled. Floyd did not object until Ms. Figuero had fully completed her answer. Gary Melendez, Figuero's son, also testified that the children said that "Maurice Floyd" shot Ms. Goss. He said the children were frightened, crying, and nervous when they first reached Figuero's home.
[10] Relevant parts of J.J. Jones' conversation with the 911 dispatcher were played during the trial over Floyd's hearsay objections. On the 911 tape, J.J. Jones said that "Maurice Floyd" was the person "who was shooting."
[11] The record indicates Figuero's moral reluctance to relate exactly the profane or sacrilegious statement made by the young male. Therefore, she used "GD" as a euphemism. The record also indicates Figuero's understanding that the term "cracker" as used in this context was a reference to a white person. The State posits in its brief that Floyd's reference was to Deputy Dean Kelly, who prevented Floyd from accosting Trelane earlier in the evening outside the sheriff's office. The State notes that Deputy Kelly is a white male and that Floyd is African-American.
[12] Brown also said that the man who dropped off children at Ms. Goss's house drove a red Honda automobile. This matches the general description of Floyd's automobile which was established through other trial testimony.
[13] Floyd objected that the excited utterance exemption was not a proper basis to admit Stokes's testimony regarding what the children had told him. The trial judge overruled the objection.
[14] Ms. Goss's husband, Clifford, testified that the lock on the door appeared as if it had been kicked or broken. He said the lock was not in that condition when he left for work on July 13 at approximately 4 p.m. Ms. Goss was not at home when Clifford left for work.
[15] In its verdict form, the jury found Floyd guilty based on the theories of both premeditated murder and felony murder. On the verdict form, the line for Count I, indicating that the jury found Floyd "GUILTY of First Degree Premeditated Murder, and First Degree Felony Murder as charged in the indictment" was checked, and the verdict form was signed by the jury foreperson. The jury found that the homicide involved a firearm. The verdict form also indicates that the jury found Floyd guilty of armed burglary of a dwelling, and that a firearm was involved in this offense. Floyd was convicted in 1999.

Additionally, the verdict form indicates that the jury found Floyd guilty of aggravated assault. Floyd does not challenge his conviction for aggravated assault. Nevertheless, we determine that competent, substantial evidence supports the aggravated assault conviction.
[16] See Spencer v. State, 615 So.2d 688 (Fla. 1993).
[17] Those statutory aggravating factors are: (1) Floyd was on probation for the felonies of burglary and accessory after the fact to robbery when he committed the murder (great weight); (2) Floyd had previously been convicted of the violent felony of the voluntary manslaughter of his brother (substantial weight); (3) Floyd committed the murder while engaged in the commission of armed burglary of the victim's home (great weight); and (4) Floyd committed the murder for the purpose of avoiding or preventing a lawful arrest (substantial weight).
[18] Those nonstatutory mitigating factors are: (1) Floyd displayed exemplary courtroom behavior in the face of much adversity; (2) Floyd assisted defense counsel throughout the proceedings by taking notes and communicating with counsel; (3) Floyd was successfully completing his probation for other offenses before he committed the murder; and (4) Floyd expressed concern that his wife conduct herself in such a way that she not use alcohol and that she not subject their relationship to the potential stresses of the use of alcohol.
[19] Those issues are: (1) the trial judge impermissibly allowed the State to exercise a peremptory challenge against a Hispanic prospective juror; (2) the trial judge erred in denying the motion for acquittal; (3) the State failed to establish a proper chain of custody for the bullet and jacket that were removed from the victim's head, and the trial judge improperly admitted those items into evidence; (4) the trial judge improperly admitted hearsay evidence in the form of testimony by State witness Jeanette Figuero, and allowed Ms. Figuero to bolster the credibility of another State witness; (5) the trial judge erred in refusing to give the defense's requested jury instruction on circumstantial evidence; (6) fundamental error occurred during the penalty phase regarding the jury instructions on mitigating circumstances; (7) competent, substantial evidence did not support the trial judge's decision to instruct the jury on the heinous, atrocious, or cruel (HAC) aggravating circumstance during the penalty phase; (8) competent, substantial evidence did not support the trial judge's finding of the avoid arrest aggravating circumstance; (9) the trial judge impermissibly admitted victim impact evidence during the penalty phase, thereby compelling the jury to recommend a sentence of death; (10) competent, substantial evidence did not support the trial judge's finding of the "committed during a burglary" aggravating circumstance; (11) fundamental error occurred during the prosecutor's penalty phase closing argument; (12) the cumulative effect of errors occurring during the trial violated Floyd's right to a fair trial; and (13) the sentence of death is not proportional.
[20] We reject the State's contention that this issue is not preserved for review. Floyd clearly had a continuing objection before the trial judge which we determine was sufficient to preserve the issue.
[21] We have previously determined that Hispanics constitute a cognizable ethnic group for purposes of preventing peremptory challenges based solely on group membership. See State v. Alen, 616 So.2d 452, 454-55 (Fla. 1993).
[22] We discuss the relief to which Floyd is entitled regarding his convictions for armed burglary and felony murder, and the finding of the murder in the course of a felony aggravator, in a subsequent section of this opinion. We therefore do not discuss his claim regarding his motion for judgment of acquittal on the armed burglary charge.
[23] The other cases on which Floyd relies for support of his assertion that the killing was not premeditated are distinguishable because: the defendant acted in a reflexive manner similar to the defendant in Forehand; the defendant was under a dominating fear of the victim resulting from the victim's repeated abuse of the defendant; or the State failed to produce sufficient evidence of premeditation. No situation similar to any of these cases occurred in Floyd's case. Therefore, no relief is warranted.
[24] In light of the competent, substantial evidence presented by the State which supports Floyd's conviction based on a theory of premeditated murder, we further reject Floyd's contention that the admission of Ms. Figuero's statement constituted fundamental error.
[25] One of the defendant's convictions in Valentine was for burglary of a conveyance with an assault or battery.
[26] The burglary statute under which the defendant in Delgado was charged, section 810.02(1), Florida Statutes (1989), stated:

Burglary means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
Delgado, 776 So.2d at 236.
[27] In Floyd's case, the trial judge instructed the jury as follows:

Before you can find the Defendant guilty of burglary, the State must prove the following three elements beyond a reasonable doubt:
Number 1: Maurice Floyd did enter or remain in a structure owned by or in the possession of Mary Goss.
Number 2: Maurice Floyd did not have the permission or consent of Mary Goss or anyone authorized to act for her to enter or remain in the structure at that time.
Number 3: At the time of entering or remaining in the structure, Maurice Floyd had a fully formed conscious intent to commit the offense of murder in that structure.
....
A person may be guilty of burglary if he or she had the intent to commit the crime described in the charge.
[28] The jury ultimately found Floyd guilty of armed burglary. In Count II of the indictment returned against him, Floyd was charged with violating sections 810.02(1) and (2)(b), Florida Statutes (1997), which state:

810.02 Burglary.
(1) "Burglary" means entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
(2) Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084, if, in the course of committing the offense, the offender:
....
(b) Is or becomes armed within the dwelling, structure, or conveyance, with explosives or a dangerous weapon....
The trial judge also gave an instruction on armed burglary.
[29] We are aware that in enacting section 810.015(2), Florida Statutes (2001), the Legislature stated its intent "that the holding in Delgado v. State ... be nullified." However, the Legislature also stated that subsection (2) of § 810.015 would "operate retroactively to February 1, 2000." The events in Floyd's case occurred well before February 1, 2000. Therefore, because the events in Floyd's case do not fall within the window established by the Legislature for retroactive application of section 810.015(2), we need not address the issue of the retroactive effect of the statute. See R.C. v. State, 793 So.2d 1078, 1079 n. 1 (Fla. 2d DCA 2001) (reversing defendant's conviction for burglary of a dwelling, based on Delgado v. State, and noting that the Legislature's language in section 810.015(2) regarding the nullification of Delgado did not apply because the defendant's actions took place prior to February 1, 2000).
[30] Moreover, after all penalty phase instructions had been read to the jury, Floyd's defense counsel answered affirmatively when the trial judge inquired as to whether "the instructions [had] been delivered as [he] indicated they would be delivered."
[31] Floyd further contends that fundamental errors committed by the trial judge were compounded by his failure to instruct the jury with regard to two proposed nonstatutory mitigators: exemplary courtroom behavior and assistance to defense counsel with note-taking and other communication. While the issue regarding these proposed nonstatutory mitigators is preserved for review, we nevertheless have determined that no fundamental error occurred with regard to jury instructions concerning mitigating factors. We also note that the trial judge ultimately found the two factors in question as nonstatutory mitigating circumstances. Moreover, when we consider that three strong aggravating factors remain in this case, it is clear that no error fundamental or otherwiseoccurred with regard to the jury instructions concerning mitigating factors that would cast doubt on the validity of the outcome of the trial itself. See Archer, 673 So.2d at 20. Thus, no fundamental error could have been "compounded" by the trial judge's failure to provide an instruction to the jury concerning two proposed nonstatutory mitigators.
[32] Though the trial judge instructed the jury on the HAC aggravator, in his sentencing order he ultimately declined to find the existence of the aggravator.
[33] Because we conclude that there was competent, substantial evidence as discussed above for the trial judge's decision to instruct the jury on the HAC aggravator, we accordingly reject Floyd's assertion that a determination of the error committed by the trial judge hinges on the exact body position of the victim as the fatal shot entered her body.

We further reject Floyd's reliance on Porter v. State, 564 So.2d 1060 (Fla.1990). Floyd's theory that the killing was based only on an act committed in the heat of passion is obviated by the State's competent, substantial evidence supporting an instruction on the HAC aggravator.
[34] The trial judge gave substantial weight to this aggravator in his sentencing order.
[35] We further reject Floyd's contention that the trial judge should have received victim impact evidence only during the Spencer hearing. Floyd cites no precedent in support of this argument.
[36] The aggravating circumstances which remain are: Floyd was on probation for the felonies of burglary and accessory after the fact to robbery when he committed the murder of Ms. Goss (great weight); Floyd had previously been convicted of a violent felony for the voluntary manslaughter of his brother (substantial weight); and Floyd committed the murder for the purpose of avoiding or preventing a lawful arrest (substantial weight).
[37] The defendant in Williams was on parole when he committed the capital crime for which he was sentenced to death.
[38] See § 810.02, Fla.State.(1989).
[39] The Braggs court subsequently reversed the burglary conviction, determining that it was bound to follow Delgado until this Court explicitly recedes from Delgado. See id. The court certified the following question of great public importance to this Court:

WHETHER SECTION ONE OF CHAPTER 2001-58, LAWS OF FLORIDA, HAS LEGISLATIVELY OVERRULED DELGADO V. STATE, 776 So.2d 233 (Fla.2000), FOR CRIMES COMMITTED ON OR BEFORE JULY 1, 2001.
[40] The majority states that Floyd is entitled to relief under Valentine v. State, 774 So.2d 934, 937 (Fla. 5th DCA 2001), review dismissed, 790 So.2d 1111 (Fla.2001). However, the majority fails to recognize that this Court dismissed review of Valentine on May 11, 2001, prior to the enactment of section 810.015.
[1] In Francis's case, the trial court instructed the jury as follows:

[B]efore you could find the Defendant guilty of Burglary, the State must prove the elements beyond a reasonable doubt:
That Carlton Francis entered a structure owned by or in the possession of [the victims].
That Carlton Francis did not have the permission or consent of [the victims] or anyone authorized to act for them, to enter or remain in the structure at the time.
At the time of entering or remaining in the structure, Carlton Francis had a fully-formed, conscious intent to commit the offense of theft in that structure.
[2] In Woodel's case, the trial court instructed the jury as follows:

Before you can find the Defendant guilty of Burglary, the State must prove the following three elements beyond a reasonable doubt:
1. The Defendant entered or remained in a structure owned by or in the possession of [the victims].
2. The Defendant did not have the permission or consent of [the victims], or anyone authorized to act for them to enter or remain in the structure at the time.
3. At the time of entering or remaining in the structure, the Defendant had a fully-formed, conscious intent to commit theft or assault in that structure.