858 So.2d 1274 (2003)
Charles Louis JOHNSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D02-3084.
District Court of Appeal of Florida, Third District.
November 19, 2003.
*1275 Bennett H. Brummer, Public Defender, and Robert Kalter, Assistant Public Defender, for appellant.
Charles J. Crist, Jr., Attorney General, and Frank J. Ingrassia, (Ft.Lauderdale), Assistant Attorney General, for appellee.
Before COPE, LEVY, and WELLS, JJ.
WELLS, Judge.
Charles Louis Johnson appeals his convictions for armed burglary with an assault, sexual battery, and attempted sexual battery. Johnson maintains that the prosecutor's comments during closing argument improperly bolstered the testimony of testifying officers, and that the jury instruction on burglary was incorrect as given, mandating reversal. We reject both claims and affirm the order under review.
On November 15, 2000, an assailant entered the victim's home through an unlocked window. Taking a knife from the kitchen, the assailant entered the victim's bedroom and attempted to rape her. The victim struggled with her assailant, biting him on the finger and breaking the knife. The attack lasted about 10 to 20 minutes before the assailant ran away.
The police subsequently found Johnson's fingerprints on a window which appeared to be the point of entry. His DNA (as well as the victim's blood) was found on a shirt left by the assailant in the victim's bedroom. Johnson was arrested and questioned by two detectives following waiver of his rights.
Johnson initially denied any involvement, claiming that he was at home with his father on the evening in question, that he had never been inside the victim's home, and that he had no idea how his fingerprints got on the window of the victim's home. He thereafter provided several even more incriminating versions of what had occurred. In his second version, he claimed that he went to the victim's home with a friend named Jonathan and opened the window, but ran away after some dogs started barking. According to Johnson, only Jonathan went into the victim's home.
Next, he admitted to entering the victim's home through the window (this time with someone named Keith), to taking a knife from the kitchen, to removing the victim's bed covers, and to struggling with the victim over the knife. In a written statement to this effect, Johnson claimed that after the struggle, he fled the house, leaving Keith alone with the victim. While not admitting to sexually assaulting the victim in this statement, he admitted to one of the officers that after struggling with the victim, he might have engaged in some sexual activity with the victim.
One of Johnson's defenses at trial was that his second statement to the police that he had only opened the window for his friend but never entered the home was the only true account of the events and that the police had coerced him into making the later, more incriminating statements. Defense counsel cross-examined the detectives who took Johnson's statements as to their interrogation methods and expressly asked whether "this child was really just telling you what you are telling him"? During closing arguments, defense counsel challenged the detectives' credibility, claiming that they had coerced Johnson's incriminating statements "work[ing] him over psychologically," putting words in his mouth. In response, the prosecutor argued that the officers had no reason to lie about the circumstances surrounding the making of Johnson's statements in part because they contained so many exculpatory statements, denials and sympathetic excuses for Johnson's behavior, that logically *1276 they could not have been planted by the officers in Johnson's mouth:
Finally, you have [the defendant's] statements.
Now, does [defense counsel] explain away the statements? Well, on the one hand, he is telling you that these detectives badgered and psychologically wore down the defendant. All right. Well, all right.
Let's say hypothetically that was true. Wouldn't the stories be better if they are putting words in his mouth? Wouldn't the words be much better like why would they put in their excuse number one, excuse number two, a guy name Jonathan [sic].
"I didn't go in. Have sympathy for me because my mom died. Have sympathy, I didn't mean to do it. I'm sorry for what I did to that lady."
Why did they put that in there. If these two officers, one of whom is retired, living in retirement land as we speak, who was not being made to testify here, not on the job anymore, has nothing to prove to anybody, why are they going to come in here, perjure themselves under oath, after she supposedly badgered this defendant, put it in their report, these stories where he told them where he minimizes what he did, where he makes excuses for what he did, where he apologizes for what he did, does that sound like the words of a detective or does that sound like the words of a 15 year old who went into a house, beat up a woman, tried to rape her and now he is confronted with the evidence against him and he is trying to make excuses for himself?
"Well, yeah, you got me on the fingerprints, but I didn't really go in the house. I just took down the screen. It was Jonathan that went in.
"Well, you got me on the shirt. You havemy DNA was found on there. I went into the room, but I didn't have the shirt. It was another guy. His name was Keith and, oh, yeah, the knife, yeah, I picked up the knife in the kitchen, but I didn't do anything with it. I just got into an argument with the woman. I never really hit her or anything. I was just protecting myself because she attacked me."
Ask yourselves is that something that two detectives got together, made up, put words in his mouth and then detailed it all and repeated it all for you after two years and got all these details and put in their sympathetic details about like how he is sorry for what he did?
I submit to you that is not what it is. It is what it is....
Notably, this argument was met by no objection from Johnson who now claims that this argument constituted improper bolstering so fundamentally erroneous in nature as to mandate reversal. We believe not.
As a general rule, a prosecutor "may argue any reasons, if supported by the evidence, why a given witness might or might not be biased in a case, but the prosecutor may not properly argue that a police officer must be believed simply because he is a police officer." Williams v. State, 747 So.2d 474, 475 (Fla. 5th DCA 1999). However, here, neither the prosecutor's observation that the retired officers had nothing to prove, nor the comment that if the detectives had wanted to make up a story, the stories would have been better, amounted to an argument that the jury had to take the officer's testimony or the statements made by Johnson to them as true because they were made or taken by policemen and policemen don't lie. Rather, the prosecutor's comments simply *1277 pointed out that, given the facts at hand, it was unlikely either that the officers' testimony concerning the recitation of events surrounding Johnson's admissions were untrue or that Johnson had been coerced as the defense suggested. Accordingly, we reject this claim as a basis for reversal.
Johnson's second claim of reversible error also rests on a point not objected to below. Johnson was charged with armed burglary with an assault or battery under former section 810.02, Florida Statutes (2000). That section defined burglary as "entering or remaining in a dwelling... with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain." Id. (emphasis added). Under this provision, "there were two ways to commit a burglary: (1) the perpetrator enters the premises without permission with an intent to commit an offense, or (2) after a consensual entry into the premises, the perpetrator remains in the building with an intent to commit an offense." Tinker v. State, 784 So.2d 1198, 1199 (Fla. 2d DCA 2001). The "remaining in" portion of the definition for burglary only applies to the second way of committing burglary. Here, there was no evidence that the victim ever consented to the defendant's entry into her dwelling. Thus, there is no issue here as to the second type of burglary. Nevertheless, the instruction given included the "remaining in" language.[1]
The State concedes that the trial court erred in including this language. However, the question remains whether the error is fundamental and mandates reversal. In this case, it is not and does not.
Whether fundamental error has occurred when the "remaining in" language has been included in a burglary instruction turns on the facts of each case. See Johnekins v. State, 823 So.2d 253, 257 (Fla. 3d DCA 2002), review denied, 845 So.2d 890 (Fla.2003); Couzo v. State, 830 So.2d 177, 180 (Fla. 4th DCA 2002); Miller v. State, 828 So.2d 445, 447 (Fla. 4th DCA 2002). The State's theory of prosecution in this case was that Johnson broke into the victim's home with the intent to commit crimes. The State did not prosecute this case on the theory that Johnson entered with consent and then remained with the intent to commit a crime. We see no scenario under which Johnson could enter someone's home uninvited through a window, secure a weapon, and accost a woman sleeping there with no criminal design. See § 810.07, Fla. Stat. (2000) (defining prima facie evidence of intent to commit a crime in a trial on a charge of burglary as "proof of the entering of [a] structure or conveyance at any time stealthily and without consent of the owner or occupant thereof"); § 810.07, Fla. Stat. (2003) (same). As we confirmed in Johnekins, 823 So.2d at 256-57, giving an instruction on a matter which is not in material dispute, such as an instruction on "remaining *1278 in" a dwelling where the sole theory of the prosecution and the evidence is that the entry was not consensual, "is properly viewed as mere surplusage and certainly not a matter of fundamental error." See also Collins v. State, 839 So.2d 862, 864 (Fla. 4th DCA 2003)(finding that "the defendant was not prejudiced by the inclusion of the `remaining in' language of the instruction because the evidence at trial pointed clearly to the `breaking and entering' method of committing the crime of burglary"); Diaz v. State, 837 So.2d 436, 436 (Fla. 3d DCA 2002)(concluding that in a case involving non-consensual entry, "the `remaining in' language may be viewed as mere surplusage"). Inclusion of the "remaining in" part of the standard burglary jury instruction in this case was mere surplusage and not fundamental error.[2]
Accordingly, the order under review is affirmed.
NOTES
[1] The trial court instructed:

Before you can find the defendant guilty of burglary, the State must prove the following beyond a reasonable doubt.
First, the defendant entered into or remained in a structure owned by or in the possession of [the victim]
Second, the defendant did not have the permission or consent of [the victim], or anyone authorized to act for her to enter or remain in the structure at the time.
Third, at the time of entering or remaining in the structure, the defendant had a fully-formed conscious intent to commit the offense of sexual battery in that structure.
* * *
Even though an unlawful entering or remaining in a structure is proven, if the evidence does not establish that it was done with the intent to commit sexual battery, the defendant must be found not guilty.
(Emphasis added).
[2] Johnson argues that reversal is required by Floyd v. State, 850 So.2d 383 (Fla.2002). We disagree and distinguish this case for the reasons well stated by the Fourth District in Couzo, 830 So.2d at 180-81, and Miller, 828 So.2d at 448.