[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13566

_____

D.C. Docket No. 3:09-cv-01017-MMH-TEM

MAURICE LAMAR FLOYD,

                                                        Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
et al.,

                                                        Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 20, 2016)

Before WILLIAM PRYOR, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Maurice Lamar Floyd shot and killed his mother-in-law, Mary Goss, as his three young children (who were Ms. Goss' grandchildren) fled to a neighbor's house. Although Mr. Floyd was only 21 years old when he killed Ms. Goss, she was the second person to have died at his hands. When he was 14, Mr. Floyd had been convicted of manslaughter in the death of his brother.

This is Mr. Floyd's appeal from the district court's denial of his petition for a writ of habeas corpus, *see* 28 U.S.C. § 2254, and we granted a certificate of appealability on three issues: (1) whether Mr. Floyd's trial counsel rendered ineffective assistance by failing to obtain and present mitigation evidence at the penalty phase; (2) whether Mr. Floyd's trial counsel rendered ineffective assistance by failing to object to the trial court's jury instruction on mitigating circumstances; and (3) whether the trial court's instruction on mitigating circumstances—to which there was no contemporaneous objection—violated Mr. Floyd's Eighth and Fourteenth Amendment rights under *Lockett v. Ohio*, 438 U.S. 586 (1978), and its progeny.

Following review of the record, and with the benefit of oral argument, we affirm the district court's denial of habeas relief. First, trial counsel made a reasonable strategic decision not to present mitigation evidence through an expert because doing so would have brought out negative and prejudicial information about Mr. Floyd. Second, Mr. Floyd was not prejudiced by trial counsel's failure

to object to the jury instruction on mitigating circumstances. Third, given the evidence presented at sentencing, Mr. Floyd has not shown that the instruction on mitigating circumstances had a substantial and injurious effect.

## I

We begin with the relevant facts concerning the crime. The Florida Supreme Court, in its opinion on direct appeal, summarized them as follows:

Mary Goss, the victim in this case, was found dead at approximately 11:30 p.m. on July 13, 1998. Police found her body on the ground beside her house located on Bronson Street in Palatka, Florida. The cause of Ms. Goss's death was a single .357 caliber gunshot that entered the left side of her face and proceeded to sever her brain stem, killing her instantaneously. Two days later, on July 15, 1998, police found Floyd, Ms. Goss's son-in-law, hiding in the attic of a house in the Palatka area. Floyd was subsequently charged with the murder of Ms. Goss.

Testimony adduced at trial indicated that Floyd exhibited very controlling behavior toward his wife, Trelane, who was Ms. Goss's daughter. On July 11, 1998 (extending into the early morning hours of July 12), Trelane had gone with some of her cousins to a supper club to celebrate her birthday. Floyd followed her to the club and spotted her consuming alcohol and dancing. He later approached the group and told Trelane that it would be necessary for her to find another way home, because he was going to take her car, which she had driven to the club. In the past Floyd had expressed his disapproval of Trelane's alcohol consumption.

When Trelane returned home around 5 a.m. on the morning of July 12, Floyd informed her that he would not permit her to sleep, and he proceeded to increase the volume on the televisions and the radio in their apartment. He also threatened to kill Trelane or someone she loved as a reprisal for her drinking or if she ever attempted to run or hide from him. Shortly thereafter, Trelane felt a gun being placed beside her head as she was lying in bed. Floyd pulled the trigger three

times, but the weapon did not fire. Trelane advised Floyd that she was going to seek a divorce and testified at trial that she did not call the police about this incident because she was in a very confused state.

On July 13, the day Ms. Goss was murdered, Trelane and Floyd had a heated argument on a Palatka street not far from their apartment. Trelane had stopped her car in the street to speak with a friend. Her three-year-old goddaughter was also in the vehicle. Floyd was in his car behind Trelane and he insisted that Trelane take her goddaughter home, calling Trelane a "whore." Fearful for the safety of both herself and her goddaughter, Trelane decided to seek protection in a sheriff's office. Floyd followed and proceeded to ram his car into the back of Trelane's vehicle.

A high speed chase ensued, during which Trelane sounded the horn on her automobile to warn both oncoming traffic and pedestrians who might be in harm's way. The tires on both cars squealed as they slid into the parking lot at the sheriff's office. Trelane exited her car and screamed for help. Hearing both the sounds of squealing tires and Trelane's plaintive cries, Deputy Dean Kelly responded from his desk inside the sheriff's office. Deputy Kelly was the only armed officer in the vicinity as the events unfolded at approximately 7:30 p.m. that evening. Trelane hurriedly reported to Deputy Kelly that Floyd had rammed her car and that she was fearful for her safety. The deputy saw Floyd moving rapidly toward them as they spoke, and he held out his hand to prevent Floyd from accosting Trelane. He then advised Floyd that he was going to be placed into investigative custody until it could be determined exactly what had transpired. Deputy Kelly instructed Floyd to turn around and to place his hands behind his back. Floyd extended his hands in the air and backed up, insisting that he had done nothing wrong and that he merely wanted to talk to his wife. After the deputy repeated his order for Floyd to submit to custody, Floyd fled the scene. Deputy Kelly began pursuit for a few moments but then halted, fearful of leaving Trelane and her goddaughter defenseless if Floyd decided to double back to attempt to harm them. The subsequent efforts of a K–9 unit and other officers to apprehend Floyd on the evening of July 13 were fruitless.

After giving a statement to sheriff's office personnel, Trelane called her mother, Ms. Goss, from a pay phone at the sheriff's office.

4

Trelane testified that she "told her [mother] what was going on" regarding the incident at the sheriff's office. Ms. Goss informed Trelane that Trelane's three children were at Ms. Goss's house. After hearing what had transpired earlier on the street and at the sheriff's office between Trelane and Floyd, Ms. Goss said of Floyd, "I won't let him get my grandchildren." Ms. Goss was also aware that the twenty-one-year-old Floyd was then on probation for previous violations of the law.

During the trial, several witnesses described the subsequent events that led to the death of Ms. Goss. J.J. Jones, the oldest of Trelane's three children, testified that on July 13, 1998, the day that Ms. Goss was killed, Floyd took him and his two younger siblings to the home of their grandmother, Ms. Goss. J.J. also stated that after he had fallen asleep that evening, Ms. Goss awakened him and instructed him to go to the home of her neighbor, Jeanette Figuero, and to call the police from there. Before he exited Ms. Goss's home, J.J. noted that she was clearly upset. As J.J. was moving toward Jeanette Figuero's home, he noticed that Floyd was "squeezing [Ms. Goss] behind the door" at the front of Ms. Goss's home. Moments later he saw Ms. Goss running outside. J.J. stated that he also observed Floyd standing on Ms. Goss's front porch and firing a gun three times. J.J.'s two siblings, LaJade Evans and Alex Evans, were directly behind him, as Ms. Goss had awakened them also. J.J. testified that he never saw Floyd leave the victim's porch, and that the last thing he observed before pounding on Jeanette Figuero's door for help was his grandmother, Ms. Goss, lying on her back. J.J. eventually led the police to the spot where he thought his grandmother's body would be. As one of the officers directed a flashlight beam on the ground, the light revealed Ms. Goss's lifeless body. Ms. Goss was clad only in a nightgown and was not wearing any undergarments.

LaJade Evans, J.J. Jones' younger sister, testified that she followed J.J. to Ms. Figuero's home to seek help. LaJade saw Floyd on the victim's porch, shooting a gun at the victim. LaJade said Floyd fired two shots from the porch, and that she heard one more shot fired in the direction of the victim. She added that she saw Floyd running toward the victim's home but that he did not go inside the home again after having fired his weapon.

5

Jeanette Figuero testified that during the evening of July 13, she heard three gunshots followed by the sounds of pounding on her door and the plaintive cries of a child or children saying, "Open the door, open the door, please open the door." Figuero's son, Gary Melendez, opened the door to allow J.J., LaJade, and Alex into the home. Figuero said the children were talking very fast and when she inquired as to the problem, they exclaimed that their grandmother, Ms. Goss, had been shot. When she asked J.J. who shot Ms. Goss, he responded, "Maurice Floyd." Figuero also testified that she heard J.J. mention Floyd's name when he talked to the 911 dispatcher. . . .

. . . .

[T]he State did present evidence of a confession that Floyd made to a friend. Tashoni Lamb testified that Floyd visited her apartment around midnight on July 13, and that he left after 6 a.m. on July 14. Floyd asked to speak with Lamb privately, out of the hearing of her children. Lamb stated that Floyd pulled a gun out of the pants he was wearing, placed it on a dresser in the apartment, and said, "I just shot Miss Mary, the grandmother." She related that Floyd's reason for shooting Ms. Goss was that "she had threatened to call the police on him." Lamb stated that she did not call the police because she concluded that they would certainly apprehend Floyd. She further testified that Floyd contacted her by phone later on July 14, a day before he was arrested. When the prosecutor asked at trial if anyone had ever asked her to provide an alibi for Floyd, she responded, "Maurice did." She also testified that during the phone conversation, Floyd asked, "Do you want to see me die?"

*Floyd v. State*, 850 So. 2d 383, 387–91 (Fla. 2002) (footnotes omitted).

The jury convicted Mr. Floyd of first-degree murder, felony murder, armed burglary of a dwelling, and aggravated assault. For Ms. Goss' murder, the jury recommended a sentence of death by an 11-1 vote, and the trial court followed that recommendation. On direct appeal, the Florida Supreme Court affirmed Mr. Floyd's convictions and sentences for first-degree murder and aggravated assault,

6

but reversed his convictions and sentences for felony murder and armed burglary.

*See id.* at 402, 409.

## II

We review the district court's denial of Mr. Floyd's § 2254 habeas corpus petition de novo. *See Owens v. McLaughlin*, 733 F.3d 320, 324 (11th Cir. 2013). Because his habeas corpus petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), Mr. Floyd can obtain relief only if the state court adjudication of a claim was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)-(2). A state court decision is contrary to clearly established law if the state court "arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law or the state court confronted facts that are materially indistinguishable from Supreme Court precedent but arrived at a different result." *Ferrell v. Hall*, 640 F.3d 1199, 1223 (11th Cir. 2011) (internal quotation marks and citation omitted). A state court decision unreasonably applies clearly established law "if the state court identifies the correct governing legal rule from the Supreme Court's holdings but

unreasonably applies it to the facts of the particular defendant's case." *Id.*  This standard is "difficult to meet." *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013).

"Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc). We are not, however, "bound to defer to unreasonably-found facts or to the legal conclusions that flow from them" if "a state court's adjudication of a habeas claim result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* at 1288 & n.5 (noting that it is the "rare case" where a petitioner will meet the requirements of § 2254(d)(2)).  In such a case, we "apply the pre-AEDPA de novo standard of review" to the petitioner's habeas claims. *Id.* (citing *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001)). *See also McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (review of a habeas claim is de novo if AEDPA deference does not apply).

### III

At the penalty phase, the state introduced victim impact evidence, evidence that Mr. Floyd had been convicted of voluntary manslaughter years earlier for killing his brother, and evidence that Mr. Floyd violated his probation.  Mr. Floyd did not testify, present any witness testimony, or submit any other mitigation

evidence at the penalty phase.  His trial counsel, Douglas R. Withee, argued in

closing that the jury should consider two mitigating circumstances:

> We feel that we have established two interesting mitigating circumstances.  The Defendant displayed exemplary behavior in this courtroom and demeanor in the face of great adversity, a sad situation that occurred here.  Adversity, you bet.  I understand that.  However, he has been displaying exemplary courtroom behavior and he has assisted me through note taking throughout this proceeding and communication and behaving himself.  I consider that to be very important.

Penalty Phase Tr., Ex. A-11 at 2164–65.

As noted earlier, the jury voted 11 to 1 to recommend a sentence of death for

Mr. Floyd.    After holding a hearing pursuant to *Spencer v. State*, 615 So. 2d 688,

690–91 (Fla. 1993), the trial court found four statutory aggravating factors (given

great or substantial weight), no statutory mitigating factors, and four nonstatutory

mitigating factors (given little weight).  Based on its findings, the trial court

sentenced Mr. Floyd to death. [1]

---

[1] The four statutory aggravating factors were that Mr. Floyd (1) was on probation for two felonies when he committed the murder (great weight); (2) was previously convicted of a violent felony, i.e., the voluntary manslaughter of his brother (substantial weight); (3) committed the murder while engaged in armed burglary of the victim's home (great weight); and (4) committed the murder to avoid or prevent his lawful arrest (substantial weight).  *See Floyd*, 850 So. 2d at 392 n.17.  When the Florida Supreme Court reversed Mr. Floyd's armed burglary conviction on direct appeal, it also struck the trial court's finding of an aggravating circumstance for Mr. Floyd's committing the murder in the course of a felony.  *See id.* at 409.

The four nonstatutory mitigating factors were that Mr. Floyd (1) displayed exemplary courtroom behavior in the face of much adversity; (2) assisted defense counsel by taking notes and communicating with him; (3) was completing his probation successfully at the time of the murder; and (4) was concerned about his wife's alcohol use and how it would affect their relationship.  *See id.* at 393 n.18.

Mr. Floyd argues that his counsel's failure to investigate and present mitigating evidence at sentencing constituted ineffective assistance. The state court and the district court rejected this claim, and so do we.

Under *Strickland v. Washington*, 466 U.S. 668 (1984), Mr. Floyd must establish that Mr. Withee's performance was constitutionally deficient, and that the deficient performance "prejudiced the defense during the penalty phase." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (internal quotation marks and citation omitted). To prove deficiency, Mr. Floyd must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To prove prejudice, Mr. Floyd must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Our review of Mr. Withee's performance is not measured against what "some hypothetical 'best' lawyer would do." *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014). Instead, we "reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective

at the time." *Id.* (internal quotation marks and citation omitted). We also keep in mind the fact that "there are countless ways to provide effective assistance," and "attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another." *Id.* (brackets omitted). *See also Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) ("If a defense lawyer pursued course A . . . our inquiry is limited to whether this strategy . . . might have been a reasonable one.").

Combining § 2254(d) and *Strickland*, we are limited to a "doubly deferential judicial review" of Mr. Withee's performance. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks omitted).

## A

At the state court evidentiary hearing, Mr. Withee testified that he hired an investigator to help him gather mitigation evidence, and that he used Dr. Harry Krop—a licensed clinical psychologist who had evaluated close to 2,000 first-degree murder cases—to analyze that evidence. Mr. Withee sent Dr. Krop an old psychological evaluation from 1991, around the time that Mr. Floyd killed his brother, which indicated that Mr. Floyd had a sleep disorder. The 1991

11

examination did not reveal any reasonable thought, mood, or personality disorder. Mr. Withee also sent Dr. Krop some of Mr. Floyd's school records and information about the incident where Mr. Floyd killed his brother.

Mr. Withee had copies of letters that he had sent to Dr. Krop, including one that stated: "I am in serious need of mitigation."  Mr. Withee also had copies of letters that Dr. Krop had mailed to him.  In one, Dr. Krop discussed Mr. Floyd's IQ scores and concluded that Mr. Floyd had a "significant discrepancy between his verbal and nonverbal acts," which could have been the result of academic deficiencies or a learning disability.  That letter, however, also stated that "all other neurocognitive functions were within normal limits."

In a letter dated March 26, 1999, Dr. Krop wrote the following to Mr. Withee: "I'm concerned my testimony would be harmful to this case and that there are few, if any, mitigating factors that could be presented[.]"  He continued: "Mr. Floyd has not been candid in providing his background[ ].  His parents have also provided inconsistent and contradictory information."  Five days later, Dr. Krop sent Mr. Withee a letter stating that he did not believe that he could present any mitigation on Mr. Floyd's behalf.

Mr. Withee testified that he no longer had an independent recollection of what Dr. Krop's diagnosis was, "but had you asked [him] to guess at what it would have been, it would have been antisocial personality disorder, which is an

12

extremely common, extremely common diagnosis." Aside from Dr. Krop's March 26 letter stating that Mr. Floyd and his parents provided inconsistent, or contradictory information, Mr. Withee could not remember any other fact that Dr. Krop had indicated would constitute harmful evidence.

Mr. Withee had also spoken with a police officer about Mr. Floyd's killing of his brother, and the officer told him that "it was a whole lot worse, toward the premeditated range than toward the voluntary [manslaughter] range." Based on what Mr. Withee knew about the killing, he did not want to cross examine any witnesses about it or give it any more attention than the state had when it submitted Mr. Floyd's prior felony convictions to the jury. On cross-examination, Mr. Withee also explained that he would not want to present a diagnosis of antisocial personality disorder to a jury.

Dr. Krop testified that his policy was to keep the files from his death penalty cases indefinitely. But neither he nor his staff could find Mr. Floyd's file, despite searching through his records for six hours. He also had little or no independent memory about Mr. Floyd's case. Dr. Krop explained that his typical evaluation involves a clinical interview, a number of psychological tests, reviewing any police reports or the defendant's prior criminal history, school records, medical records, birth records, psychiatric records, and family medical records.

In reviewing the letters that he had exchanged with Mr. Withee, Dr. Krop testified that Mr. Floyd's IQ was in the normal range. Although the difference in Mr. Floyd's verbal and performance IQ scores was "significant," that did not necessarily mean that Mr. Floyd had organic brain damage; the difference could also "suggest the possibility of a learning disability." Dr. Krop noted that Mr. Floyd had memory issues, but he likely did not find that Mr. Floyd's memory issues were related to the murder of Ms. Goss, or he would have noted it in his report. Dr. Krop testified that the "most important statement" in one of his letters to Mr. Withee was "the fact that [Mr. Floyd's] other neurocognitive functions were within normal limits." This meant that "anything related to frontal lobe or conceptual reasoning or those areas which might have a direct bearing on the offense itself were all within normal limits" and that he "therefore . . . did not . . . recommend[ ] . . . further neurological testing."

Dr. Krop also testified about the concerns that he shared with Mr. Withee about not having any mitigation testimony that would help Mr. Floyd. Although he did not independently remember any details, Dr. Krop testified that, based on the letters he sent Mr. Withee, he had "information that [Mr. Floyd] provided to me that I felt concerned about testifying in front of a trier of fact." Dr. Krop said that he typically would be concerned about things such as "if the client has a long-standing personality disorder," and "if there were things in Mr. Floyd's past with

14

regard to any history of violence or other involvement in the criminal justice system." He also said even if he had diagnosed Mr. Floyd with antisocial personality disorder, he would not necessarily decline to testify "if there are other things that can help." But if antisocial personality disorder was Mr. Floyd's only diagnosis, Dr. Krop might have to bring things up—"such as a prior criminal history and some other things that the defense attorney may not want to open the door to"—on cross examination.

Although he could not testify as to what information he had at the time that would have negated any particular mitigation in Mr. Floyd's case, Dr. Krop explained that if Mr. Floyd had a history of violence or another nexus with the criminal justice system, "there's a good likelihood that [he] would have had a diagnosis of antisocial personality disorder . . . ." Dr. Krop also testified that in a situation such as Mr. Floyd's, where he was given inconsistent and incorrect information, Dr. Krop would have bigger concerns "if it appear[ed] that the inconsistent information and the contradictory information [were] provided in a selective and self-serving manner" than if it were "simply a person not remembering."

**B**

Dr. Henry Dee, a clinical psychologist and clinical neuropsychologist, conducted a neuropsychological evaluation of Mr. Floyd in 2004. Dr. Dee testified

that he did not speak with Mr. Floyd's family, but he spoke with Mr. Floyd, conducted a mental examination, and relied upon other reports. He concluded that Mr. Floyd had an IQ of 95, with a verbal score of 87 and a performance score of 107. He concluded that this deviation was evidence of some sort of "cerebral damage," some sort of "left hemisphere dysfunction in the brain" that might be "due to some cerebral insult to injury or disease," but admitted that he did not "have an adequate set of information to tell [him] what the etiology" of the damage was. It could have been the result of brain damage, or a visual or hearing impairment.

When asked if Mr. Floyd was under the influence of extreme mental or emotional disturbance, Dr. Dee said that "certainly from a neuropsychological perspective, he did have that sort of disturbance, and yet it may not be exactly what the statute points at, I don't know, because it isn't defined." He also testified that, based on his behavior in the killings of his brother and Ms. Goss, Mr. Floyd had a substantially impaired ability to conform his behavior to the requirements of the law. His ability to appreciate the criminality of his actions, however, was not so impaired.

Mr. Floyd did not talk with Dr. Dee about the actual crime, nor admit that he had shot Ms. Goss, so Dr. Dee had no "direct information from Mr. Floyd with respect to his subjective mental state." As a result, Dr. Dee explained, "I don't

16

know what he was thinking or feeling. There's no way I could know because he's got the most information with regard to that and he said he didn't do it."

If he was classifying Mr. Floyd's condition according to the DSM-IV, Dr. Dee would call it "chronic brain syndrome with mixed features," which means "that there has been some long-standing injury, insult or disease to the brain," as evidenced by Mr. Floyd's deficient memory functioning, increased impulsivity, and irritability. Dr. Dee testified that Mr. Floyd showed "antisocial features . . . that's undeniable." But Dr. Dee did not think that Mr. Floyd met the criteria for an antisocial personality disorder diagnosis.

Dr. Robert Berland, a forensic psychologist, also appeared on behalf of Mr. Floyd at the evidentiary hearing. His opinion was that Mr. Floyd had "a psychotic disturbance, a biologically determined mental illness." Dr. Berland testified that Mr. Floyd had this illness since a "very young age." He said that Mr. Floyd admitted to suffering from a sleep disturbance, which Dr. Berland believed was "part of a manic disturbance." Mr. Floyd also admitted to "a form of psychotic thinking" and having experienced one auditory hallucination of hearing someone call his name during his current incarceration. Dr. Berland spoke with Mr. Floyd's mother, whom Dr. Berland believed was providing him information consistent with a "research supported standard of credibility."

According to Dr. Berland, Mr. Floyd met the criteria for two statutory mitigators, namely extreme mental or emotional disturbance, and a substantially impaired capacity to conform his conduct to the requirement of the law. He testified that "even if [Mr. Floyd] knows something is wrong, he will be driven to do it because of this underlying mental illness." Dr. Berland concluded that Mr. Floyd suffered from extreme mental or emotional disturbance when Mr. Floyd killed Ms. Goss, but admitted that he never spoke with Mr. Floyd about Ms. Goss' death.

Dr. Berland also opined that Mr. Floyd had multiple and cumulative brain injuries, an opinion which was based on his conversations with Mr. Floyd, Mr. Floyd's mother, and testing. He believed that Mr. Floyd suffered "early childhood brain injury," and an additional brain injury following a car accident when Mr. Floyd was 18. Finally, Dr. Berland testified that Mr. Floyd's "unstable home life as a child, [including] frequent interstate moves and school changes" was a nonstatutory mitigator.

## C

For its part, the state presented Dr. William Riebsame, an expert in forensic psychology who evaluated Mr. Floyd. His opinion differed sharply from those of Drs. Dee and Berland.

Dr. Riebsame testified that Mr. Floyd denied ever hearing auditory hallucinations and that "no other doctors" had ever observed that Mr. Floyd had those symptoms.    For example, in 1991, Mr. Floyd was referred for a psychological evaluation, which concluded that he had no psychotic symptoms, no auditory or visual hallucinations, no delusional thought process, no mental illness, no abnormal thinking, no defect or disease, and revealed no thought, mood, or personality disorders.    Instead, the 1991 evaluation mentioned only a sleep disorder.    Dr. Riebsame also reviewed evidence that Mr. Floyd "physically threatened the principal of his school while involved in a fight with a schoolmate," that he had been suspended multiple times, that he exhibited criminal behavior starting at age 10, and that by age 14, Mr. Floyd and his brother were frequently leaving the house and burglarizing neighbors and committing other property crimes.

In addition, Dr. Riebsame testified about a nearly month-long hospitalization that occurred after Mr. Floyd killed his brother.  A clinical interview revealed that Mr. Floyd exhibited no psychotic behavior, and he was not prescribed any antipsychotic medication.  A presentence report from when Mr. Floyd was a teen indicated that Mr. Floyd's mother said he could hold his temper and did not get angry easily.  But Dr. Riebsame testified that other hospital records showed that Mr. Floyd "was an irritable sort."  Dr. Riebsame explained that the car accident

19

that occurred when Mr. Floyd was a teenager caused "low back and neck pain." He was not "familiar with any kind of medical records of a head injury that occurred from a car accident."

Unlike Dr. Berland, Dr. Riebsame did not believe that Mr. Floyd suffered from either an extreme mental or emotional disturbance or that his capacity to conform his conduct to the requirement of the law was substantially impaired. Instead, Mr. Floyd was "act[ing] in ways that suggest that he's very much in control of his behavior," because he was "making choices, decisions in terms of preventing himself [from] being caught by law enforcement officers." Dr. Riebsame found it critical that Mr. Floyd was attempting to "mislead legal officials" and "sidestep any kind of responsibility" for Ms. Goss' death.

Dr. Riebsame concluded that Mr. Floyd was not brain damaged, but acknowledged that his brain "operat[es] differently than most people." Mr. Floyd did show some sort of "mild impairment," but that could "reflect a learning disorder" or "very limited educational history." In addition to a sleep disorder, Dr. Riebsame testified that Mr. Floyd "me[t] the criteria for a diagnosis of an antisocial personality disorder." According to Dr. Riebsame, Mr. Floyd made decisions based on his antisocial personality disorder, not due to a mental illness. He was irritable, aggressive, had a reckless disregard for his own and others' safety, was

consistently irresponsible, and may have exhibited a lack of remorse in killing his brother and Ms. Goss.

Dr. Riebsame did not consider Mr. Floyd's sleep disorder a nonstatutory mitigating factor, but did consider Mr. Floyd's "history of a learning disorder reflecting a brain abnormality" to be such a factor. He also testified that Mr. Floyd's chronically unstable home life and his parents' failure to intervene when he was younger could have been considered a nonstatutory mitigating factor.

### D

The state post-conviction court concluded that Dr. Krop was a "well-known expert who has testified for years" in a number of cases.  It ruled that Mr. Withee did not render deficient performance, as it was reasonable for him to rely on Dr. Krop's opinion that his testimony could harm Mr. Floyd at trial.  In part, the state post-conviction court noted that "Mr. Withee testified that an anti-social personality disorder which would have been the conclusion of Dr. Krop was not something he would want to present to a jury . . . ."  The court concluded that Mr. Withee made "a strategic decision . . . after consulting a very well respected mental health expert who had a great deal of experience in testifying in capital cases," and that "[i]t [wa]s clear that a thorough mental health work up had been done, [and] that the evaluation was done as much as could be expected . . . ."  This was particularly true given the fact that Mr. Floyd and his parents "selectively"

provided information "in order to gain advantage." Because Mr. Floyd had a violent past, including causing his brother's death, Mr. Withee's performance, in strategically deciding not to present the mitigating factors Drs. Dee and Berland testified about, was not deficient.

The Florida Supreme Court, on appeal, recognized that it has previously held that performance is deficient when the attorney never conducted a mitigation investigation and "substantial mitigation could have been presented." *Floyd v. State*, 18 So. 3d 432, 453 (Fla. 2009). But "where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information," it had affirmed rulings that the attorney's performance was not deficient. *Id.* at 453–54 ("Trial counsel's investigation into mental health mitigation is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.") (internal quotation marks and citation omitted).

The Florida Supreme Court affirmed the state post-conviction court's ruling that Mr. Withee's performance was not deficient. Mr. Withee made a strategic decision not to present mitigation evidence after he spoke with Dr. Krop. It concluded that Mr. Withee's strategic decision was reasonable "in light of [Mr.] Floyd's antisocial personality disorder diagnosis," the fact that he had killed his

brother at age 14, and the inconsistencies between the statements of [Mr.] Floyd's parents." *Id.* at 454.

The Florida Supreme Court also explained that Mr. Withee was unable to locate "much mitigation" to help Mr. Floyd and that he had spoken with a police officer who warned Mr. Withee that Mr. Floyd's killing of his brother was "a whole lot worse" than a voluntary manslaughter conviction would indicate. *Id.* Finally, the Florida Supreme Court noted that Mr. Floyd had not presented any lay witnesses during the evidentiary hearing to testify about "any abuse or neglect that he suffered as a child." *Id.* Because he presented "no non-mental health-related evidence," the Florida Supreme Court concluded that Mr. Floyd had not shown that Mr. Withee was deficient for failing to present non-mental health mitigating evidence. *Id.*

The district court, in denying Mr. Floyd's § 2254 petition, concluded that that the Florida Supreme Court's resolution of the issue was not contrary to, or an unreasonable application of, clearly established federal law. Nor was that resolution based on an unreasonable determination of the facts. The district court also ruled that, even if the Florida Supreme Court's decision was not entitled to AEDPA deference, Mr. Floyd's ineffectiveness claim was still without merit. The district court found that the state post-conviction court "resolved the credibility issue in favor of believing counsel's testimony as well as the testimony of Dr.

Krop," and concluded that Mr. Floyd had not rebutted this finding of fact with clear and convincing evidence.

The district court further concluded that Mr. Floyd was represented by an "experienced criminal defense attorney," and his mental health expert had "extensive experience with capital cases." The fact that Mr. Floyd would have received an antisocial personality disorder diagnosis, the fact that he killed his brother at 14, and the fact that his parents gave inconsistent statements, according to the district court, made Mr. Floyd's attorney's decision not to present mental health evidence to a jury a reasonable strategic one. The district court alternatively held that Mr. Floyd had not demonstrated prejudice because he had not shown "a reasonable probability . . . that the outcome of the case would have been different if [Mr. Withee] had presented mental health mitigation."

**E**

Mr. Floyd urges us to review the ineffectiveness claim without AEDPA deference under § 2254(d)(2) because he says that the Florida Supreme Court (like the district court) erred in finding that Dr. Krop had actually diagnosed him with antisocial personality disorder. Although Mr. Floyd is correct that neither Mr. Withee nor Dr. Krop testified at the evidentiary hearing that he actually was diagnosed with this disorder, both witnesses explained that Dr. Krop's reluctance to testify (and the unfavorable letter to Mr. Withee) might have been based on such

a diagnosis. We need not, however, decide whether the Florida Supreme Court's fact-finding on this point was unreasonable under § 2254(d)(2). We will assume, without deciding, that we can review the ineffectiveness claim relating to mitigation de novo, and without AEDPA deference, because that claim still fails under the more favorable standard of review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

Whether or not Dr. Krop diagnosed Mr. Floyd with antisocial personality disorder, the fact remains—and the record shows—that Dr. Krop made a diagnosis that was significantly negative about Mr. Floyd, and/or that he was concerned he would have to reveal significantly damaging information about Mr. Floyd at trial. Regardless of the specific name of the diagnosis or the precise reason that Dr. Krop concluded that his testimony would do Mr. Floyd more harm than good, Dr. Krop was so concerned about negative impact that he advised Mr. Withee in writing that he should not testify at all on Mr. Floyd's behalf.

To prevail on his § 2254 claim, Mr. Floyd needs to show that Mr. Withee was wrong to rely upon Dr. Krop's conclusion that his testimony would be harmful, not simply that Dr. Krop never officially diagnosed him with antisocial personality disorder. This, we conclude, he has not done. *See Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1249 (11th Cir. 2010) ("It is certainly not ineffective assistance of counsel for an attorney not to call an expert when doing so

25

causes his client to run the risk of having the state successfully make his client look like a sociopathic killer.").

For one thing, Mr. Floyd cannot prevail simply because he now has found new experts who have come to different conclusions than Dr. Krop. *See Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."). We are still bound by the deferential performance standard set forth in *Strickland*, even if we are not reviewing this claim under the additional deference called for by AEDPA. "The Constitution requires a good deal less than maximum performance," and "to be effective[,] a lawyer is not required to pursue every path until it bears fruit or until all hope withers." *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (internal quotations omitted).

As in *Smith v. Dugger,* 840 F.3d 787, 794–96 (11th Cir. 1988), the decision to not put on mental health mitigation evidence did not constitute deficient performance. This is not a case where counsel failed to investigate or follow leads with respect to a client's mental health. And given what he was faced with, we agree with the district court that Mr. Withee did not render deficient performance in choosing not to put on mental health mitigation evidence. First, Mr. Withee had Dr. Krop's opinion that there was little if any mitigating evidence that could be

presented.  Second, Dr. Krop told Mr. Withee that it would do more harm than good if he testified.  Third, Mr. Floyd and his parents gave inconsistent and contradictory information.  Fourth, Floyd had previously been held criminally responsible for his brother's death, and Mr. Withee had been told by a police officer that it was worse than manslaughter and closer to premeditated murder.  Fifth, the state's expert had diagnosed Mr. Floyd with antisocial personality disorder, and Mr. Withee did not want that information heard by the jury.  Sixth, the 1991 evaluation of Mr. Floyd revealed only a sleep disorder.  *See Hardwick v. Crosby*, 320 F.3d 1127, 1185 (11th Cir. 2005) ("An attorney is not obligated to present mitigation evidence if, after reasonable investigation, he or she determines that such evidence may do more harm than good.") (citation and internal quotation marks omitted); *Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir. 1995) ("The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (internal quotation marks and citation omitted).

We acknowledge that Mr. Floyd's new experts, Drs. Dee and Bernard, have offered different opinions about mental health.  But their testimony is itself not ironclad.  For example, Dr. Dee, who opined that Mr. Floyd had some sort of cerebral damage, could not tell what the etiology of the damage was.  Dr. Dee,

27

moreover, had not spoken to Mr. Floyd about Ms. Goss' murder, and though he did not think that Mr. Floyd had antisocial personality disorder, he said it was undeniable that he had antisocial features.  Dr. Bernard, who opined that Mr. Floyd had mental illness and a psychotic disturbance, also had not spoken to Mr. Floyd about Ms. Goss' murder.  And, as explained above, presenting their testimony would also have exposed the jury to substantially more negative evidence about Mr. Floyd.

Mr. Floyd also argues that the Florida Supreme Court erroneously "nullified" the non-mental health mitigation evidence that he presented at the post-conviction hearing because it was offered through expert, and not lay, witnesses.  Again, we are not persuaded.  The Florida Supreme Court merely noted that Mr. Floyd had not presented any lay witnesses on mitigation at the evidentiary hearing.  *See Floyd*, 18 So.3d at 454.

Even assuming that the Florida Supreme Court did not assess the non-health mitigation evidence provided by Drs. Dee and Bernard, so as to remove AEDPA deference, Mr. Floyd has failed to demonstrate prejudice under *Strickland*.  Drs. Dee and Bernard testified that Mr. Floyd had an unstable childhood because he moved around a lot, and that his parents failed to intervene when Mr. Floyd got into trouble—something Mr. Withee did not wish to highlight—as a child.  Significantly, however, Drs. Dee and Bernard—neither of whom had spoken to

Mr. Floyd about Ms. Goss' murder—provided no specific information about how and why Mr. Floyd's childhood affected him so traumatically. And Mr. Floyd presented no other witnesses—not his parents, a teacher, or even a friend or acquaintance—to testify on his behalf at the post-conviction hearing about his childhood, or for that matter, any other part of his life.

Mr. Floyd has not shown that there is a reasonable probability of a different result had the jury and the trial court been presented with the scant non-mental health mitigation evidence he offered at the post-conviction evidentiary hearing. Stated differently, there is no reasonable probability of a sentence other than death when the existing aggravating factors—including the circumstances of Ms. Goss' murder and Mr. Floyd's prior killing of his brother—are reweighed with the new non-health mitigating evidence. *See Sochor v. Secretary*, 685 F.3d 1016, 1029–30 (11th Cir. 2012). *See also Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1269 (11th Cir. 2012) ("[S]ubstantial evidence of aggravating circumstances . . . makes it more difficult to establish prejudice under *Strickland*.").

## IV

We now address Mr. Floyd's two claims related to the trial court's instruction on mitigating evidence. Mr. Floyd contends that the instruction violated his Eighth and Fourteenth Amendment rights, and that Mr. Withee was ineffective in failing to object to the instruction. In analyzing these claims, we

proceed to the merits and assume (without deciding) that there are no procedural bars for Mr. Floyd to overcome. We also do not apply AEDPA deference because we conclude that Mr. Floyd's claims lack merit even under de novo review. *See Berghuis*, 560 U.S. at 390.

## A

Under Florida law, the proper mitigating evidence instruction, unless the defendant requests otherwise, is as follows:

> Among the mitigating circumstances you may consider, if established by the evidence, are:
>
> . . . .
>
> 8. Any of the following circumstances that would mitigate against the imposition of the death penalty:
>
> a. *Any [other] aspect of the defendant's character, record, or background.*
>
> b. Any other circumstance of the offense.

Std. Jury Instr. in Crim. Cases—No. 96-1, 690 So. 2d 1263 (Fla. 1997) (emphasis added). When the trial court read aloud the jury instructions, it omitted the portion italicized above, and instructed the jury on the mitigation evidence it could consider as follows:

> Among the mitigating circumstances you may consider, if established by the evidence, are:
>
> One, any of the following circumstances that would mitigate against the imposition of the death penalty:

Subsection A, any other circumstance of the offense.

Penalty Phase Tr., Ex. A-11 at 2171–72.  After the instructions were read in full and the jury was sent to deliberate, the trial court asked, "Have the instructions been delivered as I indicated they would be delivered?"  *Id.* at 2177.  Both the prosecutor and Mr. Withee replied in the affirmative.[2]

The Supreme Court has held that, under *Lockett* and its progeny, including *Htichcock v. Dugger*, 481 U.S. 393 (1987), the sentencer in a capital case must, under the Eighth and Fourteenth Amendments, be allowed to consider and give meaningful consideration to all relevant mitigating evidence without improper restrictions by "state statute, judicial interpretation, or jury instructions." *Puiatti v. McNeil*, 626 F.3d 1283, 1314 (11th Cir. 2010).  The question is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).  We will assume, without deciding, that the trial court's instruction here was constitutionally inadequate under *Lockett* and its progeny because it enumerated only one possible mitigating circumstance and did not expressly inform the jury that it could consider as mitigating evidence aspects

---

[2] The record does not contain the written jury instructions for the penalty phase.  *See* Initial Br. of Appellant, Ex. B at 43 n.9 (stating that Mr. Floyd's appellate "counsel contacted the clerk of the lower court who searched the file without success for the missing written instructions" and that "[d]efense counsel was also unable to provide a written copy").

31

of Mr. Floyd's character, record, or background. *Cf. Delap v. Dugger*, 890 F.2d 285, 303 (11th Cir. 1990) (finding *Hitchcock* error where instruction stated, "the mitigating circumstances which you may consider, if established by the evidence, are these," and then listed the statutory mitigating factors). *But cf. Sims v. Singletary*, 155 F.3d 1297, 1315 (11th Cir. 1998) (finding no *Hitchcock* error where instruction stated, "the mitigating circumstances you may consider, if established by the evidence, among others, are these . . . .").

**B**

A *Lockett/Hitchcock* violation, however, does not always constitute reversible error, and is subject to harmless error analysis. *See Ferguson v. Secretary*, 580 F.3d 1183, 1204 (11th Cir. 2009); *Delap*, 890 F.2d at 304; *Demps v. Dugger*, 874 F.3d 1385, 1389 (11th Cir. 1989). The question is whether the mitigating evidence presented by Mr. Floyd, had it been considered, would have persuaded the jury to recommend a life sentence. *See Ferguson*, 580 F.3d at 1203–04; *Demps*, 874 F.2d at 1389. Although cases like *Demps* and *Delap* used the harmless error test from *Chapman v. California*, 386 U.S. 18, 24 (1967) (asking whether the error was harmless beyond a reasonable doubt), the Supreme Court has since held that, on federal habeas, a petitioner must show a "substantial and injurious effect" from a constitutional error to obtain relief. *See, e.g., Fry v. Pliler*, 551 U.S. 112, 119–20 (2007); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

32

So the precise question for us is whether Mr. Floyd can show a "substantial and injurious effect" from the erroneous instruction on mitigating evidence. *See Ferguson*, 580 F.3d at 1200 (applying *Brecht* standard to *Hitchock* claim on habeas).

We think not. As noted earlier, Mr. Whittee chose not to put on mental-health mitigation evidence, and there was no testimony from Mr. Floyd or his family members. The mitigating evidence before the jury consisted only of Mr. Floyd's age, exemplary behavior during trial, demeanor in the face of adversity, successful completion of probation until the time of the murder, and concern for his wife's alcohol use. Given the circumstances surrounding Ms. Goss' murder, and Mr. Floyd's prior killing of his brother, "we conclude . . . that the . . . mitigating evidence would not have persuaded the jury to recommend life." *Demps*, 874 F.2d at 1389. Mr. Floyd has therefore not shown a "substantial and injurious effect" from the erroneous jury instruction on mitigation.

## C

For essentially the same reason, Mr. Floyd's ineffectiveness claim related to the jury instruction fails. We will assume that Mr. Withee rendered deficient performance by failing to object to the jury instruction. But, on the evidence presented at sentencing, we agree with the Florida Supreme Court and the district court that Mr. Floyd cannot show prejudice under *Strickland*. There is not a

reasonable probability that a jury properly instructed on mitigation would have recommended a sentence of life for Mr. Floyd. *See Ferguson*, 580 F.3d at 1203–04. *See also Floyd*, 850 So. 2d at 403.

V

The district court's denial of Mr. Floyd's habeas corpus petition is affirmed.

**AFFIRMED.**